Cateon, Ch. J.
delivered the opinion of the court. í <
On the 18th of November, 1833, the legislature of this State extended the civil jurisdiction of the counties of Marion, Hamilton, Rhea, IMPMinn and Monroe, so as by the extension of the limits of the several counties, to include the country within the occupancy of the Cherokee Indians, which lies within the boundary of the State of Tennessee. But the act declares, that our courts shall not take jurisdiction of any criminal offence committed within the Indian territory, by any Cherokee In-dian residing therein, except for murder, rape or larceny. And the usages and customs of said Cherokee Indians, in all other respects, are allowed to them within the Indian boundary. 2. No white man shall be allowed to settle on the lands of the Indians: nor, 3. shall the act be construed to invalidate any law or treaty of the United States, made in pursuance of the constitution thereof. Nor shall the act authorize any entry, appropriation, or occupancy of any of the lands within the Cherokee cóuntry.
Foreman was indicted in the M’Minn circuit court in 1835, with another, for the murder of John 'Walker, within, said county.
To the indictment, the defendant in substance pleaded, that he was a Cherokee native, a member of the Cherokee .nation of Indians, residing within the jurisdiction of of the nation; and that John Walker was a Cherokee native, a member of the same nation, residing therein; and that the crime, if committed, was committed within said nation, and within the jurisdiction of its courts. That it was an independent nation, with full powers to try said offence, and that the laws of Tennessee could not, and did not, have any force there.
To this plea, the attorney for tthe government demurred. The circuit court determined, that the legislature had no power to extend the jurisdiction of our courts over the Cherokee Indians, within our limits; -overruled the *258 demurrer an(j ordered the defendant to he discharged; 7 it from which judgment the attorney general appealed to the supreme court.
Oil this complicated and important question,, much labor has been bestowed, and which has resulted in the conclusion, that the legislature has the power to cause to be punished, Indian natives, for crimes committed within the Cherokee limits, and that the act of 1833, is not in conflict with either the treaties or laws of the United. States, constitutionally made.
The authorities examined, are found in our history,, colonial charters, constitutions, State and federal; legislative acts, Indian treaties, resolutions and acts of Congress, executive acts and documents, and judicial decisions, embracing near four centuries of time, and such a vast mass of learning and evidence, as to render it impossible to compress the authorities into a judicial opinion, save to a very partial extent; yet, to some extent, it is indispensable, for an understanding of the subject. Our rights on this continent had their origin in discovery, in the fifteenth century. In 1497, John Cabot, a Venetian, then residing in England, was fitted out with a ship by King Henry the seventh, to proceed upon a voyage of discovery, and to subdue and take possession of any lands unoccupied by any Christian power, in the name, and for the benefit of the British crown. He was accompanied by four small barques, fitted out by the merchants of Bristol, from which point he sailed in May, supposing when he passed the Islands discovered by Columbus, three years before, he would reach the great continent of India, and by bearing northwest, he might reach China. After sailing west for some weeks, he discovered Newfoundland and St. Johns. He landed on these, made some observations, and brought off three of the natives. Continuing his course westward, he soon reached the continent of North America, and sailed along it from the fifty-sixth to the thirty-eighth degree of lati *259 tude, from the coast of Labrador to that of Virginia. (Robertson’s History of America, hook IX.) The subjects of Henry the VII, were undoubtedly, says Roberts'on, the first who had visited that part', of the American continent, and were entitled to whatever right of property •prior discovery is supposed to confer.
The pope claimed the right to dispose of all countries ■possessed by infidels; a right that it would have been deemed as absurd to deny before, and during the fifteenth century, as it would now be absurd to admit. In virtue •of this right, he had, in 1344, erected the Canary Islands into a kingdom, and bestowed it on Lewis de la Creda, of .the- Royal family of Castile. The most successful navigators and discoverers, previous to Columbus, in the fifteenth century were the Portuguese; especially under the reign of John, and under the auspices of his son Henry, Duke of Visco, a man greatly in advance of the age in which he lived, in scientific acquirements, and rising far above monkish superstition, b,ut adroitly profiting by its arrogance, rapacity and power. Having made discovery of the Island of Madeira, and the coast of Africa, as far as the river Senegal, but meeting with opposition from , some of the grandees, who from ignorance, from ‘‘envy, or from that cold and timid prudence which rejects ■whatever has the air of novelty or enterprise, condemned the Prince’s schemes, as chimerical, and intimated they were sinful. That their fathers had rested satisfied with •cultivating the territory providence had allotted them, and that the strength of the kingdom was already exhausted by the expense of attempting discoveries. To silence all cavil at once, and obtain the sanction of a power,' whose fiat was law to kings and emperors, Prince Henry applied to the pope in favor of his operations, representing, in pompous terms, the pious and unwearied zeal with which he had exerted himself, during twenty years, in discovering unknown countries, the wretched inhabitants of which, were utter strangers to true religion, wandering *260 jn heathen darkness, or led astray by the delusions of Ma-J J .. ... ...*5 homét. He besought the holy father, to whom, as the vicar of Christ, all the kingdoms of the earth were subject, to confer on the crown of Portugal, a right to all the countries possessed by Infidels, which should be discovered by the industry of its subjects, and subdued by the force of its arms. He promised to make it his chief object to spread the knowledge of the Christian religion, and to establish the power of the holy see, and increase the flock of the universal pastor. His holiness was entreated to enjoin all Christian powers, under the highest penalties, not to molest Portugal while engaged in this laudable- enterprise, and to prohibit them from settling in .any of the countries which the Portuguese should discover.
The high penalties referred to by Prince Henry, were those imposed by a bull of excommunication, and were ample to restrain all Christendom, then exclusively catholic, from interfering with the discoveries of Portugal. The beneficial consequences of such a step were apparent to the see of Rome, anxious to extend its power, then successfully resisted by the followers of the religion of Mahomet, in Western Asia, Prince Henry’s object being, to find and subdue that country on the south. Eugene the fourth, the pontiff to whom this application was made, eagerly seized the opportunity which now presented itself. A bull was accordingly issued, in which, after applauding in the strongest terms, the past efforts of the Portuguese, the pope exhorted them to proceed in that laudable career on which they had entered, and he granted them an exclusive right to all the countries which they should discover, from Cape Non, on the northern coast of Africa, to-the continent of India. (Robertson’s H. A. book I.) The spirit of propagating the then supposed true faith, combined itself with that of discovery, under the highest earthly sanctions, and drew to the service of the Prince of Portugal, crowds of enterprising adventurers from *261 every part of Europe, the Venetians and the Genoese, m particular, who were at that time, superior to all other nations in naval affairs, and who acquired more perfect knowledge in this new school of navigation. In emulation of these foreigners, the Portuguese exerted their own talents. The nation,and the merchants seconded the designs of the Prince; they ventured boldly into the open sea, discovered the Cape de Verd Islands and the Azores. This first essay in maritime affairs, feeble and unskillful as it appears, compared to the present state of maturity and improvement in navigation, gave' the impulse, that thirty years after, led to the discovery of America: and to tire pope’s bull of protection, and grant of the heathen lands discovered, is the world principally_indebted for the grand result. That such a power should be recognized in the head of the church, excites our wonder, yet it is entitled to our admiration, when we remember that the Roman empire had been overthrown by-a race of men ignorant and barbarous as any known to European history; and that the lingering remains of civilization was only to be found amongst a few priests, who, by force of mind and concert, established a church government, of such controlling influence, as again to civilize a considerable portion of mankind. The means employed are foreign to our present purpose: whether the pope’s bull was enforced through the superstitious fears of Christendom, or by the sword, is immaterial; it gave the law of nations, and had accorded to it the unqualified sanction of all Christian governments. Nor did the kipgs of England dare call it in question, either before or after the secession of that country from papal authority.' During the reign of Edward the fourth, some English merchants having resolved to open a trade with the coast of Guinea, John the second, of Portugal, despatched embassadors to the king of England, in order to lay before him the right Portugal had acquired by the. pope’s bull, to the dominion of that country, and to request of him to pro *262 hibit ]jis subjects from prosecuting their intended voyage. Edward was so much satisfied with the exclusive title of the Portuguese, that he issued his orders in thé terms. which they desired.'
After Columbus had returned from his first voyage of discovery, and when prepared to set out upon his second, with the most formidable and best appointed' fleet heretofore known, Ferdinand and Isabella were not willing to rest their title to the possession of the newly discovered countries upon the operations of the fleet alone, but the example of the Portuguese, as well as the superstitions of the age, made it necessary to obtain from the Roman pontiff, a grant of those territories which they wished to occupy. The pope, as the successor of St. Peter, and vicar and representative of Jesus Christ, was supposed to have a right of dominion over all the kingdoms of the earth. Alexander the sixth was applied to, and granted in full right to Ferdinand and Isabella of Spain, all the countries inhabited by Infidels, which they had discovered or should discover. As it was necessary to prevent this grant from interfering* with that formerly made to Portugal, he appointed that a line, supposed to be drawn from pole to pole, a hundred leagues to the westward of the Azores,, should serve as a limit between them; and in the plenitude of his power, bestowed all to the east of this imaginary line upon the Portuguese, and all west of it upon the Spaniards. Zeal for propagating the Christian faith was the consideration employed by Ferdinand, in soliciting this bull, and is mentioned by Alexander, as the chief motive for issuing it. See Robertson, vol. 1, p. 105. This title was then deemed completely valid, to authorize the monarchs of Spain to extend their discoveries, and to establish their dominion over such portion of the globe. Id. Vattel B. 1, ch. 18, S. 208: 1 Irving’s Col. 171.
The doctrine originated with the crusades: expeditions to recover the holy land and sepulchre from Infidels, *263 and to accomplish which, eventually, was one of the lead-f ’ Í , mg motives that gave that power oi energy and persever-anee to Columbus, which resulted in the discovery of America. The master spring was religious enthusiasm, to an extent, that the finger of scorn pointed at him as a madman. To the purposes of recovering the Holy Land from the infidel power of the followers of Mahomet, Columbus made a vow, he would appropriate the profits arising from his anticipated discoveries; to this scheme he was a devotee to the day of his death, .and solemnly provided for its accomplishment in his will. 1 Irving’s Life of. Col. 60, 73. Another object was, the discovery of Pagan nations, that might be converted to the faith of the Christian, and subdued and governed, as a means of propagating that faith, and extending the dominion of the church. Ib. 64, 72. The domination of the clergy extended over the state as well as the church; nor was it uncommon to find cardinals and bishops at the head of armies. According to the doctrine of the day, every nation that refused to acknowledge the truths of Christianity was fair spoil for the Christian invader. (72, 73.) It was contemplated by conquest to bring about what had been foretold in holy writ, that “the light of revelation should be extended to the remotest ends of the earth.” And when the court of Rome was applied to, in 1495, by the king and queen of Spain, for a bull, confirming in them the discoveries made by Columbus; the grand achievement was pronounced by the papal see, the ful-filment of one of the sublime promises made to the church; it was giving to it “the heathen for an inheritance, and the uttermost parts of the earth for' a possession.” (186.) In accordance to this claim was drawn up a formula, digested by the most distinguished and profound jurists and divines of Spain, in which the rights claimed by the church and th'e crown are fully set forth, and which was the authority and guide to all Spaniardstaking possession of, and settling newly discovered countries, inhabited. *264 by Infidels. Its terms are curious enough, but no bow differing from the British charters of settlement in substance: neither allowed to the natives any political rights. 3 Irving’s Col. 66, 347. This was not only the recognized national law of Spain, but of France, and all Europe, in 1803, when we obtained Louisiana, then a province of France, two years before obtained from Spain; and on which rests our rights of sovereignty and soil, to all that country now appropriating to the settlement of the Indians, transferred from this to the west of the river Mississippi, and for which we are warring with the Pawnee, the Osage, and other tribes, to whose claim we pay not the least respect. Every West India island, and the South and North American continents, were seized upon by the right of discovery; almost every Christian power occupied parts thereof; catholic and reformed equally claiming to hold and govern the parts first discovered, not only as against Europeans, but against the people found in the respective countries. Neither the fierce Carib, who was a notorious cannibal; his naked and unoffending neighbor of the islands, preyed upon; the amiable people of the southern continent, governed by the Incas, or those of Mexico, more than the hardy and untameable race found here, were allowed any rights; and the claim to sovereignty, (and, until recently, to soil,) by the first Christian discoverers, was enforced by the sword. From the opening of the first crusade, to this day, it is amongst the most curious and most prominent truths in the history of man.
The same motive that impelled the popes, in the fifteenth century, to send forth the Portuguese and Spaniards to conquer, equally influenced the English, in more enlightened ages. Calvert, the governor of Maryland, sent out by Lord Baltimore, in 1632, to form a colony, soon as he landed on the shore, took possession of the country, “for our Savior, and for our sovereign lord, the king of England.” 1 Graham’s Hist, of N. A. 9. So when *265 the first charter of Carolina was granted by Charles the second, the motive assigned was, to propagate the blessings of religion and the civilizing of a barbarous land. Such men as Lords Clarendon and Berkley aver, “that being excited with a laudable and pious zeal for the propagation of the gospel, they desire a certain country in the parts of America, not yet cultivated and planted, and only inhabited by some barbarous people, who had no knowledge of God.” Ib. 82.
Much as we may contemn the hypocrisy of the pre-tence for the grant of the Carolinas, yét the principle, by which the country was •taken possession of, was the only rule of action possible to be observed; one not open to question in a legal point of view, or morally wrong: it was more just the country should be peopledby Europeans, than continue the haunts of savage beasts, and of men yet more fierce and savage, who, “if they might not be extirpated for their want of religion and just morals, they might be reclaimed for their errors.” 1 Story’s Com. 6. A rule in the course of application to the natives of New Holland, now settling by Great Britain, and which will, ere long, be of necessity applied by us to the Pawnees and Blackfoot tribes of Indians, with many others near to, and on the west side of the Rocky Mountains.
A rule of which savages of this description have no just right to complain; it is the law they daily practice against each other, and under which nations have melted away, in the presence of the.Indians, for our ancestors found on this continent, nations obviously far advanced in civilized life, as the memorials left us show. Towards a people, whose principal avocation was war and human destruction, no other rule than that declared by Coke, in Calvin’s case, could be observed; nor from the earliest history of man, has any other than that they were perpetual, alien enemies, been recognized. “All infidels are, in law. perpetual enemies, for the law presumes not that they will be converted; that being a remote possibility, *266 for between them, as with the devils, whose subiects they be, and the Christian, there is perpetual hostility, .and can be no peace; for the Apostle saith, (2 Cor. vi. 16.) “And what concord hath Christ with Belial? or what part hath he that believeth with an Infidel?” Calvin’s case, 7 Co. 33: 4 Inst. 155. This was the undoubted national law, in the days of Coke and of James the first; and disgusted as we may be with its bigoted manner of assertion and indiscriminate execution, yet it continued to be as much the law at the revolution, as that the oldest son took the whole estate. And so Judge Haywood declared the rule in reference to the Cherokees, in 1826. 2 Yer. 152.
That mere wandering tribes of savages, or such as have a stated place of residence, should claim a vast extent of forest, as hunting grounds, for the nurture of wild animals, and exclude the cultivation of the earth, is unreasonable and unjust. The earth belongs to all men in general, destined by the Creator to be their common habitation; and all derived from nature the right of drawing from it their subsistence, and those things suitable to their wants. This it would be incapable of affording, was it uncultivated. Every nation is then obliged, by the law of nature, to cultivate the ground that has fallen to its share. Those people, like the ancient Germans and the modern Tartars, who, having fertile countries, disdain to cultivate the earth, and choose rather to live by rapine, are wanting to themselves, and deserve to be exterminated as savage and pernicious beasts. There are others, who avoid agriculture, and would live only by hunting and theii flocks. This was allowable, in the first ages of the world, when the earth, without cultivation, produced more than was sufficient to feed its few inhabitants. But at present, when the human race is so greatly multiplied, it could not subsist if all nations resolved to live in this manner. Those who still retain this idle life usurp inore extensive territories than they would have occasion *267 for, were they to use honest labor, and have, therefore, , . .. , . 1 7 no reason to complain, it other nations more .laborious, or too closely confined, come to possess part. Thus, though the conquest of the uncivilized empires of Peru and Mexico were notorious usurpations, the establishment of many colonies on the continent of North America, .may, on their confining themselves within just bounds, be extremely lawful. The people of these vast countries, rather overrun than inhabited them. Vattel B. 1, ch. 7.
It is a celebrated questiop, says the same author, whether a nation may lawfully take possession of a part of a vast country, in which there are found none but erratic •nations, incapable, by the smallness of their numbers, to people the whole? It has been observed, in establishing the obligation to cultivate the earth, that these nations cannot exclusively appropriate to themselves more land than they have occasion for, and which they are unable to settle and cultivate. Their removing their habitations through these immense regions, cannot be' taken for a true and legal possession; and the people of Europe, too closely pent up, finding lands of which these nations are in no particular wrant, and of which they make no actual and constant use, may lawfully possess it and establish colonies there. Were it otherwise, our globe would not be sufficient to maintain a tenth part of its present inhabitants. People have not, then, deviated from the views of nature, in confining the Indians within narrow limits.
Partly in conformity with these just rules of national . law, but principally by the authority of the rule, estab- ■ lished by the see of Rome, conferring soil and sovereignty on the discoverer, was this continent settled and colonial charters granted.
All the charters vested sovereignty in the grantees, .substantially in the same terms. By that of the seventeenth, Charles the second, to Lord Clarendon and others, (13th June, 1675,) granting the Carolinas, it is declared and covenanted on part, of the Crown: “And forasmuch *268 as we have made and ordained the aforesaid Edward, Lord Clarendon, &c., their heiis and assigns, the true lords proprietors of the province or territory aforesaid: Know ye, therefore, moreover, that we, reposing especial trust and confidence in their fidelity, wisdom, justice and provident circumspection, for us, our heirs and successors, do grant full and absolute power by virtue of these presents, to them, the said Edward, Earl of Clarendon, &c., their heirs and assigns, for tho good and happy government of the whole province or territory, full power and authority to erect, constitute, and make several counties, baronies and colonies of, and within the said provinces, territories, lands and hereditaments in, and by the said letters patents granted, or mentioned to be granted, as aforesaid; with several and distinct jurisdictions,, powers, liberties and privileges; and also to ordain, mako and enact, and under their seals to publish any Jaws and constitutions whatsoever, either appertaining to the whole state of the province or territory, or of any distinct or particular county, barony or colony, of or within the .same, or to the private utility of particular persons, according to the best directions, by and with the advice, assent and approbation of the freemen of said province or territory, or of the freemen of the county, barony, or colony, for which such laws or constitutions shall be made; and the same laws to execute upon all people within said province or territory, county, barony, colony, or the limits thereof, by imposition of penalties, imprisonment, or any other punishment; yea, if it shall be needful, and the quality of the offence require it, by taking away member or life: to be done by the lords proprietors, their deputies, or judges; to grant pardons, establish courts of justice, &c.
Full power and authority is given to the lords proprietors, their heirs and assigns, at their will and pleasure, to assign, alien, grant, demise or enfeoff the premises, or any part or parcel thereof, to him or them that shall be *269 willing to purchase the same, and to such person or persons as thpy shall think fit; to be held of them the said Edward, Lord Clarendon, &c. and not of us, our heirs and successors. ’
.Power to train and organize armies, erect and maintain forts, and to make war, defensive and-offensive, is given of which we will have occasion hereafter to speak.
'.The above charter included what now constitutes the States of North and South Carolina, Georgia, Tennessee, Alabama and Mississippi, for although it purported to extend west to the South Sea, yet a great portion of the .country was undiscovered, and that west of the Mississippi river was afterwards claimed by France, in virtue of the discovery and settlement made by La Salle, in 1685, under the authority of Louis the fourteenth. The absolute powers granted to the proprietors, had hardly an exception, save that the country should be a province of England; the reasons for which, are found in the volatile and'reckless character of Charles the second, and in the characters and situation of the eight eminent persons, to whom the grant was made, whose fidelity the monarch had experienced in his exile, <£or whose treachery'had contributed to his restoration,” and who were his principal officers of state.
The province under the first charter, 'in 1663, had been divided into two counties, Cape Fear river being the boundary of division; the northern was 'called Albe-marle, the southern Clarendon, and eventually, the province was separated into North and South Carolina. "Within the limits of the northern colony, and in the midst of whom the English formed their early settlements, were various tribes of Indians: the Pasquotanks, Tuteloes, Meherrins, Wapomeaks, and Chowanocks, on the north; the Tuscaroras, Hetteras, Coraminesej Pamplicoes, Mat-tamuskeets, andCroatans, on the east; the Saras, Neuses, Saponas and Sippahaws, on the south; with the Qhero-kees and Ghickasaws on the west, extending far inland. *270 Those were the people, “there abiding,” for whose better g0vern3nentj charter was published, to all to whom it might concern. Martin, in his history of North Carolina, informs us, (vol. 1, 127-8,) that the tribes within the range of the North Carolina settlements, had large towns, inclosed with huge palisadoes, and sent several hundred, and some several thousand warriors to the field; others, less stationary and numerous, depended for subsistence on the chase, and wandered about in search of advantageous hunting grounds. The more peaceful were sometimes disturbed by irruptions from the warlike nations that dwelt on the northern lakes, even as far as the Simmagons, who dwelt in Canada, and who, while their country was covered with snow, came southerly to prey on the occupants of a softer climate. The Indians from the west side of the Apalachian mountains, even those of the Mississippi, at times joined the northern invaders, and the country exhibited, in miniature, the spectacle which Europe and Asia has witnessed in the irruptions of the Huns, the Goths and the Vandals, on the Gauls and the Germans, and the Tartars on the Chinese.
Thus surrounded by savages, destroying each other for mere pastime, with the fierceness of wild beasts, a colony was attempted in their midst on the coast of Carolina, and after a struggle of about three-fourths of a century, was fairly crowned with success. This great effort to build up a civilized community, was accomplished partly by compacts with the Indians, partly by laws passed for their government, but mainly by the sword. The tribes found inland, have passed under the dominion, and melted away under the influence and superior powers, mental and moral, of the white man; as did the savages of Europe, Asia, and Africa, pass under the dominion of the Romans, and as will him of Australasia, Africa, and the Rpcky mó'|s¡»$RÍns, be compelled to submit to the stroke of fate sooner or later; to accept a master or perish. It is the destiny of man; ignorance and division cannot stand *271 before science and combination^ nor can the civilized community exist by the side of a savage foe; and foes to each ■ether, and foes to all men, our ancestors found the North American savages — the main business of tlieir lives being war, and that a war of extermination; the foe taking no prisoners, save for the exercise of a refined cruelty — to burn him at the stake. A people that had no government, and with whom the right of the strongest alone was respected. ' --
-The philosopher and jurist of the qtiiet city, may easily prove, that such a people had undoubted rights of soil and of sovereignty; and sympathy and .eloquence may, as in the Cherokee case, powerfully urge their adoption on the courts of justice, forgetting that~it was impossible for our ancestors to recognize the rights claimed; that they had actually, by law and the sword, established what their charters granted, dominion over all abiding within their limits; and this upon a principle admitting of no countervailing .right — that of self-preservation;' they were obliged to conquer and to govern, or to perish. Such rights as they acquired were transmitted to us, unless they have been impaired by the American Revolution, or the institutions, laws, and treaties consequent upon the Revolution. If so, to the destruction of sovereignty, it can be safely affirmed, the people of North Carolina and Tennessee Lave been overreached by indirect provisions in the federal constitution, treaties and acts of Congress, of which they were unaware for nearly fifty years after we declared ourselves independent of Great Britain. ~
• In the cause of Worcester against the state of Georgia, it is declared, “That the colonial charters asáerted a title rgainst Europeans only, and were considered as blank pa-ner, so far as the rights of the natives were concerned. That the power of war was given ohly for defence, not ior conquest. 6 Peters, 546. That our history furnishes no example, from the first settlement, of our country, of smy attempt on the part of the crown to interfere with the *272 internal affairs of the Indians, further than to keep out the „ „ . , , agents of foreign powers, who, as traders or otherwise, might seduce them into foreign alliances. The king phr-chased their lands, when they were willing to sell, ata price they were willing to take, but never coerced a surrender of them. ' The king also purchased their alliance and dependence, by subsidies; but never intruded into the interior of their affairs, or interfered with their self-government, so far as respected themselves only.”' Is it true of the Carolina charter, that it asserted a title against Europeans only, and that it was considered as blank paper in reference to Indian rights ?
Parts of the charter have been set forth, and in language cogent as its distinguished authors were masters of, asserts a title against all within its limits, both as to soil and sovereignty^ and provides most distinctly for the exercise of the latter over the Indian natives; and the power of war is given in the amplest terms to the proprietors to enforce the charter. The crown of Great Britain did not recognize in the North American savages any posses-sory rights of soil, or afford them protection, save in particular cases, until the middle of the eighteenth century, and then only as matter of policy. • The first distinct general prohibition on British subjects not to settle within the Indian hunting grounds, or not to purchase lands from the' Indians, was, by the proclamation of George the third, -in 1763, consequent upon the conquest of Canada and the' treaty of Paris. The governors of the newly acquired countries on this continent, as also the governors op commanders-in-chief of the other colonies in America, “are prohibited for the present, until our further pleasure be known,” not to grant warrants of survey., or pass patents-for lands beyond the Indian boundaries; which lands not having been ceded to or purchased by us, are reserved to the Indians, or any of .them. That the absurdity of conferring the.- right of sovereignty on the various tribes of Indians • within the British limits, who had no organized *273 governments, and who never had been, recognized by any civilized power as belonging to the family of nations, might not be inferred, the proclamation provides-^ — “And we do further declare it to be our royal will and pleasure, for the present, as aforesaid, to reserve under our sovereignty, pro-, tection and dominion, for the use of said Indians, all the landsand territories not included within the limits of our said three new governments, or within the limits of the territory granted to the Hudson’s Bay Company; as also all the lands and territories lying to the westward of the sources of the rivers which fall into the sea from the west and northwest, as aforesaid, and we do hereby strictly forbid, on pain of our displeasure, all our loving subjects from maldng any purchases or settlements whatever, or taking possession of any of the lands above reserved, without our special leave and license for that purpose first obtained.
It is next provided, that those residing bn the Indian lands remove therefrom. And because of frauds and abuses having been committed, in treating by individuals for Indian lands, it is strictly enjoined, “that no private person do presume to make any purchase from the Indians, of any lands reserved to them within those parts where we have allowed settlements, but the same shall only be purchased for us, in our own name, at some public assembly or meeting of said Indians, to be held for that purpose by the governor of our colony within which they shall lie.”
The last clause requires all officers, as well military as those employed in the management and direction of In-dian affairs, “within the territories reserved, as aforesaid, for the use'of said Indians,” to apprehend all persons flying from justice.
How little ground there is for the assumption, that the British government did not assert dominion over the Indians, is manifest from this most important state paper, which has been from its date to this day, the charter of *274 jncjjan relations to the colonies, and to these states. That private persons could not purchase lands from the Indians, wag a¡wayS tbe ]aW) because the lands were granted by the charters, or where the governments were royal, the lands were holden to belong to the crown, regardless of the Indian occupancy, if such was its pleasure.
. How the charter to lord Clarendon and others was “considered” by the grantor, Charles the second, appears from its face; and how it was considered by the grantees, them future acts will best attest.
Of the forms of government established and administered by the proprietors, or of the laws enacted by the colony of North Carolina, for the first fifty years after its settlement, we have no particular account. The first regular legislative acts recognized by the states of North Carolina and Tennessee are those of 1715, when an act was passed (ch. 59), restraining the Indians from molesting or injuring the inhabitants of that government, and securing to them the right and property of their own lands. Iredell 31.
In 1711, the Tuskarora war broke out, there having been a combination to destroy the colony, by all the In-' dian tribes on its immediate border. The colonists on the-Neuse, about Newbern, were generally massacred in the most treacherous and cruel manner. This revolt was suppressed with the aid of troops from South Carolina. In allusion to which, the statute of 1715 recites: “Whereas, before the late war, daily and grievous complaints of the depredations of the Indians were exhibited against them, by divers persons bordering upon, and residing near to the habitations of the said Indians. For the prevention of the like disorders for the time to come,” &c. It is enacted, that whoever shall discover any Indian, killing, hunting, or in pursuit of any horses, cattle, or hogs, the property of a white man, every such person, on discovery or sight thereof, may, and is hereby empowered, to apprehend and seize every such Indian or Indians, and him or them so *275 taken, to convey before some ,one of the commissioners to be appointed for Indian affairs, or before the next magistrate; which commissioner or magistrate, together with the head man or ruler of the town to which such Indian delinquent belongs, is, and are hereby empowered to punish every such delinquent, in such manner as the nature of the case may require, and to award restitution to the party injured, for all damages he may have sustained; saving always an appeal to the governor and council by either party, that may think himself aggrieved.
“Sec. 3. That if any difference-shall (for the future arise between any white man and Indian, concerning trade, or otherwise, howsover, every such difference shall be heard, tried, and determined by such commissioners as the governor or commander-in-chief, for the time being, shall appoint, together with the ruler, or head man of the town, to which the Indian belongs. Saving only the right of appeal, as herein before saved and excepted.”
Further than this, the exercise of sovereignty was not. desirable; yet that the whole power to govern the Indians, was claimed and exercised to every necessary extent, is free from doubt. The statute of 1715,'stands unrepealed to this day; it extended to every part of the government of North Carolina, and although it may not in practice have been extensively applied to the Clierokees, still no judge of the colony could pronounce, it void, because the charter “was a blank piece of paper,” and conferred no power to enact the statute. _
Unfortunately, in the discussion of our Indian relations, the claims to soil and to sovereignty, have been confounded as identical. Nothing is further from truth, or more • calculated to embarrass the understanding of the subject. From the first settling of Carolina, so early as the year 1669, it was ordained by the 112th constitution, of the form of government, drawn up for the colony by Mr. Locke, that “no person whatever shall hold, or claim any land in Carolina^ by purchase or gift, or otherwise, from the na *276 tives, or any other whatsoever, but merely from, and uu--¿jje ior¿[s proprietors, upon pain of forfeiture of all his estate, movable or immovable, and perpetual banishment. 1 Martin’s H. Appendix.
When this scheme of government, so celebrated for its author, and its extravagant folly, was abandoned, a siinilar provision was made by the fourth section of the act of 1715, declaring that no white man should purchase from an Indian, without leave from the governor and council. After the charter was surrendered by the proprietors (1729), the royal government, by the act of 1748 (ch. 2, sec. 5 and 8), provided, that “no person, for any consideration whatsoever, shall purchase or buy any tract, or parcel of land claimed, or in possession of any Indian or Indians, but all such bargains and sales shall be, and are hereby declared to be null and void, and of none effect, and any person so purchasing, shall forfeit, &c.”
“Sec. 8. And whereas the Indians complain of injuries received from people driving stocks of horses, cattle and hogs to range on their lands; for remedy whereof, be it enacted, that persons driving stocks to range, or stocks actually ranging on the Indian lands, shall, and are hereby declared to be liable and subject to the like penalties and forfeitures, and may be proceeded against in the same manner, and subject to the same recoveries, as by the law of this province, stocks driven or ranging upon any win te people’s land, are liable and subject to; and the said Indians shall and may enjoy the benefit of the laws in that case made and provided, in the same manner as the white people do or can; any law, usage, or custom to the contrary notwithstanding.”
Boundaries .had been assigned to the Indians by contracts with them, denominated treaties, as still continues to be the case, defining their lands, occupied by the respective tribes, and the exclusive use of which the act of 1748 secured to them; but so far from recognizing sovereignty in the Indians, the statute, by the strong *277 est implication, denies its existence, declaring, that for trespasses committed by the whites within the Indian limits, the courts of the colony shall afford relief, as in case of like trespasses on the lands of white persons.
We maintain, that the principle declared in the fifteenth •century as the law of Christendom, that discovery gave title to assume sovereignty over, and to govern the unconverted natives of' Africa, Asia, and North and South America, has been recognized as a part of the national Jaw, for nearly four centuries, and that it is now so recognized by every Christian power,' in its political department, and its judicial, unless the case of Worcester has formed an exception in these states. That, from Cape Horn to Hudson Bay, it is acted upon as the only known rule of sovereign power, by which the native Indian is coerced; for conquest is unknown in reference to him in the international sense. Our claim is based on the right to coerce obedience. The claim may be denounced by the moralist. We answer, it is the law of the land. Without its assertion and vigorous execution, this continent never could have been inhabited by our ancestors. To abandon the principle now, is to assert that they were unjust usurpers; and that we, succeeding to their usurped authority and void claims to possess and govern the country, should in honesty abandon it, return to Europe, and let the subdued parts again become a wilderness and hunting ground. It is in the memory of man, and almost in that of the middle aged, when the valley of the Mississippi was a wilderness, a great portion of it is yet so, and before we adjudge its continuance in that state, for the benefit of a few tribes of savages, we should look well to our powers, and the probability of submission to our judgments, lest the authority of the judiciary be weakened by successful resistance. It is not on the title to sovereignty of a few Cherokees only, we are deciding; a small tribe with a population not more than equal to the third of a respectable county in all, and in Tennessee *278 perhaps less than five hundred; but we must contemplate , . , , m, the immense west and northwest. JLlie many savage tribes claiming the prairies, the Rocky mountains, and great country beyond. Tribes that subsist on the raw flesh, and are savage as the most savage beasts that infest that mighty wilderness. It is from the hunter of the Rocky mountains the jurist must draw lessons of the truth oí our position, as well as from the forensic scholar, and orator of the refined city. And in the consideration of this subject, it is our duty not to shrink from a principle on which the title and value of Louisiana depend, either because modern casuists condemned it, or because the Popes of Rome made, and by the force of their once sovereign authority, established it. Its promulgation may have been a harsh fiat, and it may have been cruelly executed by the Spaniards in Peru and Mexico; yet it is the fiat of our recognition, from the Catholic reign of Henry the Seventh, through every change of religion and government in England, by the colonies up to the revolution, and the States having Indian relations since. The Christian enthusiast, who fled from persecution, real or imagi-inary, at home, claimed the right the moment he set foot on the American shore, to convert and to govern the unconverted “heathen;” he professed it to be his principal aim and leading object; and claimed the right, then unquestioned, to enforce his pretensions by the sword, if resisted; and he and his descendants have enforced it, from the rock of Plymouth to the Rocky mountains, for our authorized fur companies have never made, or will they ever make an inquiry after Indian rights — the rifle and the knife are referred to as their passports: Refined sensibility and elevated philanthropy may hold what it will, the truth is, neither our theory or practice has ever allowed to the Indians, any political right extending beyond our pleasure. The "principle, in its application, is general, extending to to all the Indian nations and tribes on this continent, to which the Cherokees form no exception. Theirs is not a case of conscience before this court, but a case of law.
*279 But suppose in this, we are mistaken, and that our right to' assume jurisdiction over the Cherokees must be rested on conquest, what then is their condition?
That i these Indians, in common with all ^others east of the Mississippi, had passed under the dominion of the British-crown before the American revolution; that we succeeded to all the rights of Great Britain by that event; and that the 'Indians have been holden in subjection by the United States since, we hold to be admitted historical facts, recognized by the courts of justice, (Johnson vs. M’Intosh, 8 Wheaton). The case of the Cherokees is more unfavorable than this; they, in fact, surrendered their sovereign power to the British crown. -
In 1720, the inhabitants of South Carolina having for a time been in open revolt, the charter of the proprietors, so far as it extended jurisdiction over that colony, was declared forfeited by the Crown, and-.was repealed by scire fcicias.
In 1728, the House of Commons in England addressed the king, praying him to contract with the lords proprietors, for the purchase and surrender of-their charter and title to the Carolinas, promising to make compensation out of the next aid granted by Parliament. The king made the proposition, to which seven of the eight proprietors agreed, in consideration of £2,500 each, which was confirmed by act of Parliament, 2 Geo. 2 C. 34. From this time, (26th July, 1729), the government of the northern province became regal, as that of the southern had for a time been. The provinces were separated by an order in ■ council, and a dividing boundary fixed, (1 Martin’s H. 301, 1 L. U. S. 466). On the 29th of April, 1730, George Burrington was appoipted governor of North Carolina, and the administration of the government settled much in the form it afterwards continued up to the Revolution.'
The prosperity of the |king’s new acquisition, depending in a great degree on the tranquility of its inhabitants, *280 ^ ^iad keen jud§ed ky die ®ldds^ ministry, an object of primary importance to secure the friendship of the nations 0f Indians, by whom there was most reason to apprehend it might be disturbed. For this purpose Sir Alexander Cumming was sent to conclude a treaty of alliance with the Cherokees, at that time a warlike and formidable nation. They occupied the land on the back part of the settlements of both of the colonies towards the Apalachian mountains. The country they claimed as their hunting grounds was of immense extent, and the boundaries of it had never been ascertained. The inhabitants of their different towns were computed to amount to more than twenty thousand, six thousand of whom were warriors, fit to take the field on any emergency. The relation of peace with this nation was an object of importance to the Caro-linas, and likewise to the mother country. Sir Alexander arrived at Charleston about the same time that Gov. Burlington arrived at Edenton. lie lost no time, and in a few weeks, after met the chiefs of the Cherokee lower ■town, at Keowee; they received him with marks of friendship and esteem. Messengers were immediately sent to the towns in the middle, valley, and over-hill settlements, to summon a general meeting of the chiefs for the purpose of holding a congress with Sir Alexander, in the month of April, at Requassee.
Early in the month of April, the chief warriors met Sir Alexander at the place appointed, and acknowledged King George for their sovereign lord, and, on their knees, promised fidelity and obedience to him. Sir Alexander, by their unanimous consent, appointed Moytoy commander in chief of the Cherokee nation, and the-warriors and different tribes acknowledged him for their king, and promised to be accountable to him for their conduct. Sir Alexander made several useful presents to the Indians, and the congress broke up to the satisfaction of all. The crown, or diadem of the nation, which consisted of five eagle tails, and four scalps of their nation, was brought *281 from Tennessee, their chief town, and Mojhoy presented it to Sir Alexander, desiring him to lay it at the feet of his sovereign; but at his request, the Indian king deputed six of Ms warriors to carry it to England, and there to do homage with it to the king. They accompanied Sir Alexander to Charleston^ and embarked on board of th'e; Fox ship of war.
On the 30th of June, the Fox ship of war, on board of which Sir Alexander Cumming and six Cherokee chiefs had embarked, arrived at Dover. They proceeded to London, were introduced to the king, and laid the regalia of their nation at the foot of the throne. Considerable presents were made to them! of cloth, guns, shot, Vermillion, flints, hatchets, knives, &c. They entered into a treaty, by which they submitted themselves and their people to the sovereignty of the king and his successors; they engaged not to suffer their people to trade with any other nation than the English, not to permit white men of any other nation to build forts or cabbihs, of plant corn among them; and in case any such attempt was made, to give information of it to the king’s governor, and to do' whatever he would direct for the maintenance and defence' of the king’s right to the country. They engaged to apprehend runaway negroes, and deliver them to their owners or to the governor; and a gun and 'watch-coat were'1 agreed to be given to them for every negro they apprehended and brought back. Provision was made for' the punishment of any Englishman killing an Indian, and the surrender of any Indian killing an Englishman was stipulated. They were sent back by the ship that brought them, and met their countrymen with the highest idea of the power and greatness of the English nation, and not a little pleased with the kind and generous treatment they had received. Such is the account given by Martin in his history of North Carolina, of this transaction, vol. 2, p. 3, 9, 11.
Smollet, in his history of England, (2 vol. 384,) in- *282 from us) year, (1730,) seven chiefs of the Cherokee nation of Indians in America, were brought to England by gjr Alexander Cumming.' Being introduced to the-king, they laid their crown and regalia at bis feet, and by an authentic deed, acknowledged themselves subjects to his dominion, in the name of their compatriots, who had vested them with full powers for this purpose. They were amazed and confounded at the riches and magnificence of the British court; they compared the king and queen to the sun and moon, and the princes to the stars of heaven, and themselves to nothing. They gave their assent in the most solemn manner to articles of friendship' and commerce, proposed by the lords commissioners, for trade and plantations; and being loaded with presents of necessaries, arms, and ammunition, were r'econveyed to their own country, which borders on the province of South Carolina.
It must be borne in mind, that in 1730, the Cherokee nation was composed of various tribes making no pretence to regular government, and that the amendment which now presents itself in the upper towns, is the growth of the last thirty years, and has been brought about by half breeds, and whites residing amongst them, aided by the fostering, care of the government; and that the number who govern the common Indian at present, is limited to a very few, as we are informed by the reports of the Senate and House of Representatives of the congress of the United States, made in 1830; and which give the best known account of otn^ Indian relations.
Great Britain established a military post called Fort Loudon, in the midst of the upper towns on the Little Tennessee, near Tellico; which the Indians besieged in 1760, starved the garrison into a capitulation, and when they got it into their power, and under the escort of a pretended safe conduct, fell upon the British soldiers and massacred a great portion of them. The Indian war had then existed some two years, and great exertions were *283 made by North Carolina to suppress it; a statute was passed, (1760, ch. 1), granting aid to bis majesty: and for the greater encouragement to persons to enlist voluntarily against the Cherokees and other Indians in alliance with France, every Indian that might be taken during the war, it was declared should be the slave of the captor; and ten pounds was offered for every Indian killed, to those not in actual service, and five pounds to those in service, to be proved by the production of the scalp, with a title to all plunder taken from the enemy or within twenty miles of. any Cherokee town. The Cherokees suffered exceedingly in 1760 and 1761, by the Provincial and British troops marching three several times in the nation and destroying their towns. They of course came out of the war conquered and partly destroyed. The peace of 1763 between France and England, left the Cherokees dependent on, and at the mercy of the latter power; and so they continued until the American revolution. Their history after this is too well known to require further reference to it'here.
The Cherokees, therefore, like the other tribes and nations of Indians residing south of the mountains in North and .South Carolina, (twenty in number', at the least), were conquered by Great Britain, and surrendered their last claim to independence in 1730, to the crown itself, after the provinces had become royal governments: as to them, therefore, the assumption in Worcester’s case, that they remained unconquered, because the charter to the proprietors did not confer the right of conquest, but only of defence, is unfounded, as is the assertion throughout unfounded. The charter does, in cogent terms, vest in the lords proprietors the right of vanquishing and taking savage enemies; and being taken, to put them to death by the law of war; or to save them at their pleasure. The right to govern savages, having been based on the principle that discovery gave title, the term conquer, is not used in the charter; as it could not with propriety be, in reference to a *284 loose and straggling multitude, not formed into a recog- . . , ° mzed society — rand so all the North American savages were deemed by Great Britain and other Christian powers; how justly, is now too late to inquire. The proprietors had limits assigned to their province, and ample powers given of war, of' life and of death, as a means to govern CC«ZZ the people there abiding;” they needed nothing more, nor had their sovereign higher powers to confer. But taking the Cherokees to have been a recognized nation of people, as is assumed by the supreme court of the United States, then they were conquered, and the rule laid down in Calvin’s case, (7 Co. 34,) applied to them. “If a Christian king should conquer a kingdom of an infidel, and bring them under his subjection, there ipso facto the laws of the infidel are abrogated, for that they be not only against Christianity, but against the law of God and nature .contained in the decalogue; and in that case, until certain laws be established amongst them, the king himself, and such judges as he shall appoint, shall judge them and their causes according to natural equity, in such sort as kings in ancient time did with their kingdoms, before any certain municipal laws were given.”
Who are infidels subject to this rule of national law? “Heathens, (says the same author, 1 Inst. 6,) who may not be witnesses by the laws of this kingdom, because they believe neither in the Old or New Testament to be the word of God, on which oaths must be taken.” Such was the condition of the Cherokees during the colonial government, and so it is now, with a few exceptions.
The rule laid down in Calvin’s case is, that until certain laws be established, the king, or judges appointed by him, shall judge the infidels, and their causes, according to natural equity, and in such sort as kings in ancient time did before municipal laws were given. In precise conformity with this rule, is the act of 1715, ch. 59. Indian commissioners to reside amongst them, were to be appointed by the governor of the province, (the king’s *285 deputy); and a commissioner, together with the ruler or head man of the town to which the Indian party belonged, were to ajudge and determine all controversies arising between the white and Indian inhabitants, in such manner as the nature of the case might require. From which decision, either party might appeal to the governor and council. No further certain laws were established, or deemed necessary by the colony. Since the revolution, congress has passed laws for the punishment of crimes within the Indian limits, grounded on its power to' regulate commerce with the Indian tribes, thereby superceding the laws of the colony-; but the courts of the Union have very justly pronounced them unconstitutional and void. It' follows, if the States have no jurisdiction likewise, that murder on the highway, and other crimes, must go unpunished, and that the Cherokees are in fact, whatever jurists may pronounce them in name, a separate, sovereign, and independent State; and did they now own the lands claimed long since the revolution, might form a splendid monarchy, and may yet form a respectable one, within the limits of the original states, notwithstanding the constitution guarantees to every State in the Union a republican form of government, and that no new State shall be erected within the jurisdiction of any other State, even republican and of the Union, without the consent of the legislature of the State concerned. Consent to the erection of a Cherokee sovereign government1, by the federal power, is certainly wanting, on the part of North .Carolina .or Tennessee.
A total dissolution of the British government took place when the colonies declared themselves independent, and success fully maintained the assumption; and by the revolution, the States of the Union succeeded to all the rights of soil and sovereignty, over the territory within the chartered limits which pertained to Great Britain before tire change of government. The separate States were independent of each other, as to internal" government. *286 Thus circumstanced, North Carolina, in December, 1776', ' t J i ? by a congress, convened at Halifax, proceeded to establish a constitution and form of government, prefaced by a declaration of rights, made part of the constitution, (sec. 44). The boundaries of the State to which the constitution extends, are declared; being the same that now exist, Tennessee inclusive; and it maintains, “that the people of this State ought to have the sole and exclusive right of regulating the internal government and police thereof; that all the territories lying within the boundaries described, are the right and property of the people of the State, to be held by them in sovereignty. Provided, always, that this declaration of rights shall not prejudge any nation or nations of Indians, from enjoying such hunting grounds as may have been, or shall hereafter be secured to them by any former or future legislature of this State.” The proclamation of 1763 declared the In-dian hunting grounds should be the territories lying to the westward of the sources of the rivers which fall into the sea from the west and northwest; and all the subjects of the king were strictly forbidden from making purchases or making settlements, or taking possession of any of the lands above reserved, without license for that purpose obtained. These were the hunting grounds referred to in the constitution of North Carolina. They included all of what is now the State of Tennessee, and that part of N. Carolina lying west of the Blue Ridge, on the waters of New River and Tennessee, including territory equal to four large counties, part of which is now in possession of the Cherokees. The western end of this State was claimed by the Chickasaws. If it be true, (as holden in Worcester’s case, 6 Peters, 561), that the Cherokee nation was a distinct community, occupying its own territory, with boundaries, accurately described, in which the laws of North Carolina could have no force, and which the citizens of North Carolina had no right to enter, but with the assent of the Cherokees themselves; and the *287 same being true of the Chickasaw nation, then North Ca-rolma was greatly mistaken m issuing grants for the services of the revolutionary soldiers, and to pay the arrears due the army, for the greater portion of the valúa-ble lands lying within the exclusive jurisdiction of these Indian governments, and beyond that of North Carolina, '“and in which her laws could have no force”; yet she did order the country to be entered upon, cause it to be surveyed and granted, and the lands to be settled by her people, which they have enjoyed for fifty years to a great extent, dining all which time, her power'to assume jurisdiction has not been questioned; and with all due deference to the highest judicial tribunal in the Union, we think that the jurisdiction of North Carolina, as assumed by her State constitution, will not now be questioned, when both sides of the controversy for jurisdiction are-heard, freed from a controlling sympathy, in favor of the weak and withering remnant of a people, sought to be rescued from annihilation. In this conclusion we are fortified by the great and well considered - case of Johnson against M’Intosh; the reasoning in which, by the same distinguished jurist, it must be admitted, if not in direct opposition, is greatly in conflict with Worcester’s case, as the argument on the part of the State but too manifestly proves. v
North Carolina, in virtue of her sovereighty and jurisdiction legislated without the least regard to any supposed title in the Indians, to the lands claimed by them. In July, 1777, she made a treaty with the Cherokees, at Long Island, on the Holstein, fixing the boundaries of the Indian hunting grounds. Hayw. Hist. 488. In her land law of the next year, (1778, c. 3, s. 5,) she prohibited entries from being made west of the line described in the treaty. This boundary left open to location only a small portion of the eastern part of East Tennessee; but in 1783, (ch. 2, s. 5,) the Cherokees were restricted to south of the Tennessee, Holstein, French Broad and *288 Pigeon rivers, cutting them off from nine-tenths of the hunting grounds they claimed within the limits of North Carolina.
The Indians could set up no claim on the score of merit. They had been in fact, what the national law held them in theory, perpetual enemies to the people of North Carolina, and continued • either treacherous friends, or open enemies to the country, now comprising Tennessee, up to the year 1795; making war upon the people residing in the limits, ceded by the treaty of Hopewell, of 1785. Hardly a family of the early settlers, but can number some of its former members amongst the slain, generally at or near their own dwellings, and far off from the Indian towns or boundary. The Cherokees were then wild, vindictive savages, whose amusement was war upon us;' this we had a'-right to expect; we had also a right, as American citizens, to expect protection from the federal power;' but so far from receiving protection, the conduct of that power, unfortunately afforded encouragement to the Cherokees. We were not permitted to enter their country, and punish them there by an offensive war, al~ though the work of death was daily doing upon us, at our own doors; and although the Indian country was occasionally invaded near its borders, it was always deemed unlawful by the general government. The claim on the part of the federal power to protect and govern, in fact, the In-dian tribes, residing within the limits of the States, in' exclusion of the State authorities, was the basis of this policy, and has resulted in,a controversy for jurisdiction between the states and the general government, as momentous as any arising since we became independent; to understand which, the authority and proceedings of the latter power must be examined.
As early as June, 1775, the continental congress began to take steps to obtain the friendship of the Indians, and secure the safety of our western borders. Indian departments were established, and the same policy in sub *289 .stance, pursued, that had been by Great Britain. This e , ■ r , ., was ox course by assumption oí power, and necessarily without limit, as the power of revolution must be. An existing government was to be destroyed, and another founded on its ruins; until this was organized, all power rested with the revolutionary tribunal; it will, therefore, be useless to look into the resolves of the continental congress on Indian relations.
On the 1st of March, 1781, the articles of confederation were finally adopted, in which it is provided, “each State retains its sovereignty, freedom, and independence, and every power-, jurisdiction and right, which is not by this confederation expressly delegated to the United States in congress assembled.” Art. 2. “No State shall be deprived of territory, for the benefit of the United States.” Art. 9. “The United States, in congress assembled, shall also have the sole and exclusive right $nd power of regulating the trade and managing all affairs with the Indians, not members of any of the States; provided, that the legislative right of any State, within its own limits, be not infringed or violated.”
The clause, that no State should be deprived of territory, was resisted by Maryland, Massachusetts and New Jersey. They insisted, the charters calling for the South Sea, and extending in fact to the Mississippi, included the unsettled crown lands of the British King, for which the States equally were wasting their blood and treasure; and to permit Virginia, North Carolina, and Georgia, to hold so immense a fund, would leave them not only able to pay their revolutionary debt, but rich ■ after its extin-guishment; whereas, the other States would earn the fund and then be oppressed with poverty. The articles of confederation from this consideration principally, were postponed, especially on the part of Maryland, from the 9th of .My, 1778, to the 1st of March, 1781. But although it was desired, that the property in the lands should be deemed to belong to the United States, and *290 disposed of for the benefit of the whole confederation, yet it was declared there should be reserved to the States, within whose limit such crown lands might be, the entire and complete jurisdiction thereof; and the articles were adopted on the faith, that the States holding crown lands, would surrender them for the benefit of the whole united.
The legislative rights of the States, where Indian nations or tribes not incorporated into the body politic, resided' within their limits, having been carefully reserved to the States, this reservation was, for a time, respected by congress. Thus the Catawbas, in November, 1782, applied to congress to cause the lands reserved to them, in South Carolina, to be so secured to the tribe, that they could not themselves part therewith. Congress recommended to the legislature of South Carolina, to take measures for the security of the tribe. They were no more members of that State, than the Cherokees were of North Carolina, yet congress did not see proper to act.
The first general step taken by congress in Indian affairs, in virtue of the power to regulate the trade, and manage all affairs with the Indians, was by resolve of the 15th of October, 1783. They ordered that a convention be held with the Indians of the northern and middle departments, for admitting into favor those who had been at war with us, and for establishing boundary lines, separating the white citizens from the Indian villages. But they resolve, that these measures should not be construed to affect the territorial claims of any of the States', or their legislative rights within their respective limits.
The next step worthy of notice here, was taken March 15th, 1785, preparatory to making the treaty of Hopewell. Three commissioners were to be appointed, to • treat with the Cherokees and other Indians in the south, who had been at war with the United States; notice of which was to be given to the executives of North Carolina, Virginia, South Carolina and Georgia, “in order *291 that each of them appoint one or more persons to attend during the treaty, if they think proper.” William Blount was appointed on the part of North Carolina. The commissioners were to inform the Indians of the great occurrences of the late war with Great Britain, and of the extent of country relinquished by the treaty of peace. To inform them of course, that all the rights the King of England had to govern them, we had won by the sword, and were ready to enforce.
Benjamin Hawkins, Andrew Pickens, Joseph Martin, and Lachlin M’Intosh, were appointed by the authority of the United States, commissioners to treat with the southern Indians. They were to meet the Creeks at Galphinston, in Georgia, and the Cherokees, at the Keowee, (the east branch of Savannah river,) in South Carolina. Mr. Blount was instructed, by the governor of North Carolina, to be present, “at each of the treaties, as the representative or agent of the State.” “You will be pleased,” say his instructions, “to use your best endeavors to advance the interests of the State, and to prevent any encroachments upon the territory, or liberties of the same.” These bear date the 3rd of September, 1785.
On the 11th of November, Mr. Blount informed the governor of North Carolina, that the Creeks had not met the United States commissioners. Although no treaty was entered into, the commissioners of congress, soon after their arrival at Galphinston, showed to the agents, on the part of North Carolina and Georgia, the draft of the treaty they meant to propose to the Indians; against which, the agents of Georgia, entered a formal protest, because in their opinion the proposed treaty tended to deprive their State of a part of Her soil and sovereignty.
To this protest, the commissioners of congress, gave a written answer, from which the following is an extract: “We find, moreover, that the several Indian nations have uniformly, both before and since the revolution, been treated with as free and independent people, and the sole *292 proprietors of the soil, until any part of it is fairly and willingly purchased from, or relinquished by them; that the protection and guardianship of these1 their rights, which were universally allowed to have been in the King of Great Britain, are now devolved upon, and vested in, the congress of the United States, which they have exercised before, as well as since our independence, and very early, divided the execution of this trust into three districts — the Northern, Middle, and Southern.”
On the 1st of March, 1786, Mr. Blount informed Governor Caswell, that the Cherokees, Chickasaws and Choctaws had met at Hopewell, on the Keowee, and formed treaties very prejudicial to the State of North Carolina; that the treaties were the same in substance, except as to boundary.
In the letter of 22d November, 1785, to the commissioners, Mr. Blount says: “Having yesterday had the honor to lay before you my commission, appointing me agent, on the part of the State of - North Carolina, I now consider it my duty to lay before you the following extract, from the constitution of that State, which was agreed to, in full convention, at Halifax, on die llthwof December, 1776; (he here recites the article, declaring the boundaries of the State,) and to remark to you, that years after the formation, and publication of the aforesaid constitution, the State of North Carolina entered into, and signed the articles of confederation, by which she has not given up to the United States, any part of the soil described in the aforesaid constitution, nor the sovereignty thereof.”
By another letter, of die 28th of November, Mr. Blount informed the commissioners, that North Carolina had a law in force and use, allotting the lands south of the Tennessee and Holstein, and west of French Broad and Pigeon, to the Cherokee Indians, describing the boundaries, as in the land law of 1783. Should you, (says the letter,) by treaty, fix any other boundary between North Carolina and the Cherokee Indians, that State will consi *293 der such act, as a violation and infringement of her _ . .. . . 1 . ° ° legislative and constitutional rights. ^
He refers the commissioners to the fact, that the military district had been laid off within the county of Davidson, and that several millions of acres, had been granted out of the military district; and says, the underwritten agent, on the part of the State of North Carolina, protests against the treaty, at this instant, about to be signed and entered into, between B. H., A. P., J. M., and L. M., commissioners on part of the United States of America, and the Cherokee Indians, on the other part, as containing several stipulations, that infringe and violate the legislative rights of that State.
A similar protest was entered against the Chickasaw treaty, dated July 10th, 1786.
The Cherokees had been engaged in the revolutionary war, they and their ally had been conquered; no provisions in the treaty of peace had been made by Great Britain, for their protection; they were not supposed to know the effect of the revolution, and but imperfectly, that the contest had ended. To them, the treaty of Hopewell was one of peace, and the terms were prescribed by the conqueror, who met the Indians with it in his hand, and said, by way of introduction to the treaty stipulations, “The commissioners plenipotentiary of the United States, in congress assembled, give peace to all the Cherokees, and receive them into the favor and protection of the United States of America, on the following conditions: 1. All prisoners to be restored, as all negroes and goods: 2. All prisoners taken from the Indians to be restored to them: 3. The Indians acknowledge themselves under the exclusive protection of the United States: 4. The' boundary allotted to the Cherokees, for their hunting grounds, to begin at the mouth of Duck river, on Tennessee; to run N. E. to the ridge dividing the waters of Duck and Cumberland, and with the ridge, until the line run N. E. will strike the Cumberland, forty miles above *294 Nashville, UP ^13 river to the Kentucky road; thence to Cumberland Gap; thence to the mouth of Cloud’s Creek,, 0n Holstein, (below Rogersville); thence to the chimney top mountain; thence to the mouth of Camp creek, (above Greenville,) on Nollichuckey, and to the North Carolina line. 5. None to settle on the allotted lands; those that had, to remove in six months, or to forfeit the protection of the United States-, and the Indians to punish them as> they saw proper, except the people south of French Broad and Holstein, whose situation was to be submitted to congress: 6. The Indians, or persons residing with them, or taking refuge there, who should commit robbery, murder, or other capital crime, on any citizen of the United States, or person under their protection, to be delivered up, and punished according' to the ordinances of the United States, the same as if committed by citizen against citizen: 7. The same punishment to be indicted by the United States, for similar crimes upon Indians: 8. Retaliation not to be practised.”
Condition the ninth, on which the peace was granted: “For the benefit and comfort of the Indians, and for the prevention of injuries, or oppressions orí the part of the citizens, or Indians, the United States, in congress assembled, shall have the sole and exclusive right of regulating the trade with the Indians, and managing all their affairs, in such manner as they think proper.”
“10. Until congress act on the 9th article, traders to be protected in person and property.” Condition thé 12th; “That the Indians may have full confidence in the justice of the United States, respecting their interests, they shall have the right to send a deputy of their choice, whenever they think fit, ,to congress.”
This treaty, with those made at the same time with tire Choctaws and Chickasaws, are the ground work of the great question, now threatening the repose of the Union, in five of the States, if no more. Congress assumed the power to conquer, and to govern the conquered, by *295 setting up independent governments, being neither States of the Union, or territories of the United States, yet within the limits of the original States forming the cohfe-deration, notwithstanding the States were declared to have retained the sovereignty and right of soil, and that the legislative right of any State should not be infringed, or violated within its limits, in the exercise of the power to regulate trade, and manage all affairs with the Indians.
If the power was in congress, to establish and govern Indian sovereignties, over a country, hounded north by the Cumberland and Ohio rivers, west by the Mississippi, south by the thirty-first degree of north latitude, and east, by the Blue Ridge, in the midst of North Carolina, the same authority could, and of course would he exercised ■north west of the Ohio, and thus, the larger and better portion of the country, acquired by the revolution, and the treaty of 1783, would be formed into governments, never ■ contemplated by the articles of confederation. Congress had the power to regulate intercourse with the Indians, ■and might admit white men to reside amongst them, citizens or foreigners; and if, for the prevention of injuries or oppressions, on the part of the citizens or Indians, she could exercise the sole and exclusive government of the country, and allow the Indian nations to be represented in congress, nothing stood in the way of the creation of a great federal power in the west and south. Such authority is assumed by the treaty of Hopewell, in terms so decidedly explicit, as to admit of no doubt to what extent congress claimed power. Truly, the Choctaws and Chickasaws were not authorized, as the Cherokees were, to send a deputy of their choice to congress, hut the same authority that conferred this high privilege on the Cherokee nation, might confer it on every Indian tribe within the bounds of the Union.
' North Carolina was feeble, worn down by the war, and could only complain. The treaty had donated to the *296 Cherokees, nearly half the State, and the most fertile part of it, including, perhaps, a million of acres of granted land, and on which resided many of her citizens, especially in East Tennessee, and west of the line, running from Cumberland Gap to the mouth of Camp creek, on Nollichuckey, the condition of some of whom, however, (those residing south of French Broad and Holstein,) was by the treaty referred to the mercy of congress, before they were turned over to that of the Cherokees, as all others were residing within the prescribed Indian limits, who did not remove within six months after the ratification of the treaty.
The legislature of North Carolina, which met in the fall of 1786, had the facts, occurring at the treaty of Hopewell, communicated to them by the governor; a report was made, and a protest entered, to the powers assumed by congress, as will be seen from the following extracts from their proceedings, which are given at some length, because the history of our Indian relations forms the law of this case, and the records set out can only be had at the secretary’s office of North Carolina.
“The treaties entered into by commissioners, under the authority of congress, with the Indians of the Cherokee and Chickasaw nations, are so inconsistent with the legislative rights of this State, and such an infringement on the constitution, that I flatter myself they will not be passed over unnoticed by you.” Extract from Governor Caswell’s Message.
“The house resumed the consideration of the report of the committee on sundry papers, respecting Indian treaties, &c.; which being read and amended, was concurred with in the following words, viz: Extract from the Journal of the House of Commons, January 6, 1787.
*297 “Your committee, to whom was referred sundry papers, respecting Indian treaties and Indian affairs, beg leave to report, That they have examined with attention, the papers to them referred, and they find that, by the treaties entered into between the commissioners appointed by the United States, to treat with the southern Indians, and the Cherokee and Chickasaw Indians, at Hopewell, on the Neowee, the commissioners of the United States, have allotted to the said' Indians, certain lands, as their hunting grounds, which are obviously within tfie jurisdiction of this State, being north of the boundary established by law, between the citizens and Indians, and a great part of which is for a valuable consideration sold to our citizens, some of whom are now actually liv-ihg thereon.
-“Your committee observe, that the commissioners having only allotted these lánds to the Indians, as their hunting grounds, the treaty doth not thereby annul the title of those who hold under our laws, but has clogged it in a manner different from the intentions of the legislature, and which does in effect, suppose a right in ■ the United States, to interfere with our legislative rights, which is inadmissible.
“Your committee, thereupon, recommend that the delegates .of this State in congress, be instructed to state our rights to the lands in question, to the United States of America, in congress assembled, to obtain a disavowal of the treaties, so far as they affect the same; and, if the same should be persisted in, which your- committee cannot suppose from the known rectitude and wisdom of congress, that, finally, they formally protest against the same.”
On the same day, the following joint resolutions were adopted by both houses, viz:
“Resolved, that this general assembly, conceive the said treaty, as far as it relates to ceding to the Indians certain lands, within the bounds or limits of this State, is *298 clearly aa infringement of the legislative and territorial •• ft rights of- the same, as set forth m the constitution of the State, and therefore cannot be conceded to.
“Resolved, That it is the sense of this general assembly, that this State has an indefeasible right to a considerable part of the lands ceded by the said treaty to the Indians, which right was obtained by purchase from the natives; and that even congress are not at liberty to dispose'of any part of the sawe, by treaty, sale or exchange.
uResolved, As the opinion of this general assembly, that the exclusive privilege, granted by the confederation, to the United States in congress, to decide on peace and war, was never meant or intended to authorize the cession, of any part of the territory, of the individual States in the Union, as described and ascertained by their several ancient charters: And whereas, many of the citizens of this State,, have obtained from the same, tifies to lands on the waters of the Mississippi, and some of them already reside thereon, who must necessarily be greatly injured, should they be compelled to. remove with their families therefrom: And whereas, by the express words of the said treaty, they are declared out of the protection of the United States, if they did not, in a limited time, leave their habitations and retire out óf the ceded bounds: And whereas, the said treaty, should it be carried into effect-, would deprive the officers and soldiers of the late continental line of this State,, of a great part of the bounty of lands allowed them by the general assembly, as a reward for military services, in bringing about our glorious revolution: It was promised to them, became a debt of justice and gratitude, and was almost the only recompense the State had to give to those hardy veterans, who spent their time and shed their blood, in the service of their country; the honor of the State was pledged to secure their rights, arid it would be highly unjust to snatch the boon from them, when no equivalent is obtained from *299 die United States: And whereas, it is impracticable for many of the citizens of this State, who have settled themselves-within the limits of the said cession, to remove agreeably to the tenor of the treáty, and must, therefore, be exposed to the cruelty and'ráge of the mer-■ciless savage; ;
•“Resolved, Therefore, that the delegates from this State, in congress, be instructed to oppose the ratification of the said treaty, in the most explicit and decided terms; and in case the same should take effect, (which from the known rectitude and wisdom of congress, cannot be supposed,) to enter thereto the formal protest of this State.” J ■ .
It is holden, in Worcester’s case, (6 Peter’s, 559,) that the Indian nations had always been considered as distinct, independent political communities, retaining their original natural rights, with the single exception imposed by irresistible power, excluding them from intercourse with European nations; of course, they had the right to form treaties, like other independent nations. And the constitution of the United States, by declaring all treaties made, as well as those to be made, to Be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nation.
'So the second article of the treaty of Tellico, made in October, 1798, with the Cherokees, stipulates, that “The subsisting treaties between thé present contracting parties, are acknowledged to be in full and operating force; together with the construction and usages under their respective articles, and so to continue.”
„ In construing the ninth article of the -treaty of Hopewell, the supreme court of the United States (6 Peters, 554,) declares a surrender of self-government was never intended by the Cherokees; and so to'hold, would be a perversion of the necessary meaning of (he Indians. “Is it credible,” says the court, “that they should have considered themselves as surrendering to the~United States ' *300 the right to dictate their future cessions, and the terms on ' which they should be made, or to compel their submis-s¡0n to the violence of disorderly and licentious intruders? It is equally inconceivable, that they should have supposed themselves, by a phrase thus slipped into an article on another most interesting subject, to have divested themselves 'of the right of self-government, on subjects not connected with trade.”
The foregoing assumption is a brief summing up of the argument of Mr. Wirt, in the Cherokee case, found between pages 74 and 84, where the extent of the rights claimed for the Cherokees, and sanctioned by the supreme court, may more at large be seen.
The commissioners, at the treaty of Hopewell, held, that the protection and guardianship of the rights of the Indians had been in the king of Great Britain, which guardianship, by the revolution devolved upon, and was vested in the congress of the United States.
The British king claimed the right of sovereignty, protection and dominion, within the language of the proclamation of 1763, over all the- territories and people there abiding, discovered by his subjects, and by force of the right of discovery. He had enforced his claim so set forth, so far as the safety of the colonists required, or the situation of the Indians permitted, on all parts of this continent, where there were British colonies, controlled alone by his sovereign will and pleasure. Furthermore, in 1730, fifty years before the treaty at Hopewell, the Cherokees had surrendered all their political rights to the British crown, by the most solemn treaty known to the Indian history: first, to Sir Alexander Cumming, in the Cherokee nation, and then by a deputation of seven chiefs .again to the king in person, at London. “Being introduced to the king, they laid their crown and regalia at his feet, and by an authentic deed, acknowledged themselves ■subjects to his dominions, in the name of all their compatriots, 2 Smollett, 348. When the commissioners *301 .speak of the independence of the Indians, they refer principally to the right of the soil, this they claimed tor congress, as George the third had possessed it. Why should they have “slipped” into an article of the treaty, a phrase, imposing on the Cherolcees, that which, through illiterate ignorance, was not understood, when they came to a conquered people, with the rights of the conqueror devolved upon them by another conquest, dictating conditions of peace, to allies of the British crown? Why allow the Cherokees to choose and send a deputy to congress, if independent of congress? The'assumption to regulate their trade, and manage all affairs with them, by acts of congress, is, and ever has been, conclusive of their political condition.
Notwithstanding the assumptions of federal power, in the treaty of Hopewell, congress, in the important ordinance, passed 7th August, 1786, forforming Indian departments, appointing superintendents, &c., ordains, “That in all cases, where transactions with any nation or tribe of Indians shall become necessary to the purposes of this ordinance, which cannot be done without interfering with the legislative rights of a State, the superintendent in whose district the same shall happen, shall act in conjunction with the authority of such State.”
In accordance with this ordinance by another of the 26th Oct., 1789, it is resolved, that the executive, or the legislature, if they be in session, in the States of North Carolina, South Carolina and Georgia, be,- and they are authorized to appoint one commissioner each, who, in conjunction with the superintendent for southern Indian affairs, or in his absence, by themselves, treat with the southern Indians, which treaties shall be conclusive.
On the first of September, 1788, a proclamation issued, .ordering off the Cherokee lands, certain obtruders within the limits of North Carolina, which concludes: “Provided, that nothing contained in this proclamation shall be con- *302 . strued as affecting the territorial claims of North Carolina.
Thus stood the relations of North Carolina with the Cherokees and the federal government, up to the formation of the constitution of the United States.
In 1790, April 2d, was ceded to the United States, the soil and sovereignty of the western part of North Carolina, now forming the State of Tennessee, upon various conditions, subject to which, the cession was accepted, the fourth of which declares, “that the territory so ceded shall be laid out and formed into a State or States, containing a suitable extent of territory, the inhabitants of which shall enjoy all the privileges, benefits and advantages, set forth in the ordinance of the late congress, for the government of the western territory of the United States.”
The ordinance referred to, had been passed in July, 1787. It provides that the territory of the United States, northwest of the Ohio river, should, for the purpose of temporary government, be one district. Until an assembly was organized, the governor and judges were to adopt any of the laws, civil or criminal of the original States; thereafter, the assembly was to make laws. The northern Indians claimed and possessed much the greater portion of the country; yet the ordinance declares, “for the prevention of crimes and injuries, the laws to be adopted or made, shall have force in all parts of the district; and for the execution of process, criminal and civil, the governor shall make proper divisions thereof;” and that the parts to which the Indian title has been extinguished, shall be laid off into counties.
For the punishment of crimes, therefore, we had by a compact with congress, imposed as a condition on which the country was ceded, jurisdiction over all parts of the territory, and the governor was to form it into divisions and counties for the execution of process. Nine tenths of the country was within the Cherokee and Chickasaw *303 boundaries, as prescribed by the treaty' of Hopewell. The territory, and State to be formed therein, was forever to remain part of the confederacy, (art. 4); and when it had sixty thousand free inhabitants, was to be admitted into the Union on an equal footing with the original States, and be permitted to form a permanent constitution and State government.
In February, Í796, Tennessee formed her State constitution, in which she sets out lines of division between this State and North Carolina, as described in the cession act, and declares, “That all the territory, lands and waters, lying west of said line, as before mentioned, and contained within the chartered limits of North Carolina, are within the boundaries and limits of this State, over which the people have tire right of exercising sovereignty and the right of soil, so far as is consistent with the constitution -of the United States, recognizing the articles of confederation, the bill of rights, and constitution of North Carolina, the cession act of the said State, and the ordinance of the late congress, for the government of the territory northwest of the Ohio.” This ordinance reserved the Indian title: “The utmost good faith shall always be observed towards the Indians; their lands and property shall never be taken from them without their consent; and in their property, rights and liberty, they shall never be invaded or disturbed, unless in just and lawful wars, authorized by congress; but laws founded in justice and humanity, shall from time to time be made for preventing wrongs being done to them, and for preserving peace and friendship with them.”
So far as protection to occupy the soil is secured to the Indians, our constitution recognizes the ordinance of 1787; but it assumes general jurisdiction, to exercise the right of sovereignty over the Indian country without restriction.
On the 1st of June, 1796, congress admitted the State of Tennessee into the Union, (ch. 47). After reciting *304 tbcit congress was bound to do so by the act of cession from North Carolina, it is declared, the territory shall be one State by the name of Tennessee, and be one of the United States, on an equal footing with the original States, in all respects whatever.
It is the duty of the United States to guaranty to every State a republican form of government, (art. 4, sec. 4) „ Of course, our constitution was submitted to, and received the sanction of congress, so that, “by common consent,”' in the language of the ordinance for the North West Territory, we assumed sovereignty over the country within the Indian boundary. If it be true, however, that “the Cherokee nation is a distinct community, Occupying its own territory, in which the laws of Tennessee can have no force,” then it must be equally true, that the constitution of 1796 fell a dead letter at the Indian boundary, just as' much as if we had attempted to extend our jurisdiction beyond the Mississippi into the dominions of Spain. Such is the assumption in Worcester’s case; a principle that it is impossible for the States to abide by, without partial distraction; and one that should be most solemnly re-considered by the distinguished tribunal asserting it, before its enforcement is attempted upon the States of North Carolina, Georgia, Alabama, Mississippi and Tennessee, all of whom have extended their laws over the Indians within their limits; as have Maine, New York and Ohio.
We next come to the treaty of Holstein, to the better understanding of which, some previous circumstances need be noticed. Ten of the States having ratified the constitution of the United States, it was adopted, and went into operation on the 4th of March, 1789. In July, 1788, North Carolina had called a convention to deliberate on the ratification. This convention resolved, by a majority of 184 to 84, that the most ambiguous and exceptionable parts of said constitution of government ought to be laid before congress, and a convention of the States, for amendment, previous to its ratification by North Carolina. A *305 declaration of rightsxof twenty articles was proposed, and twenty-six amendments, the first of which, is in these' words: “That each State in the Union shall respectively retain every power, jurisdiction and right, which is not by this constitution delegated to the congress- of the United State's, or to the departments of the federal government.” The first amendment proposed by the minority is to the' same effect.
It was resolved unanimously, that the president of the' convention transmit to congress, and to the executives of the' Other twelve States, copies of the resolution and amendments proposed: And it was declared, that the convention of North Carolina thought proper neither to ratify or reject the constitution, and it adjourned without day, (Elliott’s Debates, 217). Afterwards, amendments, now part of the constitution, were proposed by congress to the States, the twelfth of which declares, “The powers not delegated to the United States by the constitution, nor prohibited by it to the States, are reserved to the States respectively, or the people.” With this, N.Carolina felt satisfied, and on the 11th of January, 1790, she was admitted into the Union, (4 Elliott, 222). Her senators, in April next after her admission, by deed, transferred the western territory to the United States. Still a considerable portion of North Carolina not ceded, was within the Cherokee boundary. That she then believed she was not deprived of jurisdiction over it, is attested by the foregoing transactions. Iiow readily power passes from the weak to the strong, recent expériénce had taught her. The treaty of Hopewell had /transferred to the Chérokees many of her people, and half her territory, and although no express power to authorize' further encroachments on her jurisdiction was found in the constitution, lurking powers were feared and attempted to be guarded against. Had North Carolina believed, that by the trea-' ties and by the acts of congress, the'United States could erect an independent Cherokee government within her' *306 limits^e ^iave ratified the constitution? Did she intend to surrender her jurisdiction, as claimed undoubtedly since 1730, to legislate for her entire territory? That she did not, is manifest. Even when ceding the western end of her state, it was made an express condition that the legislation of the territory should be co-extensive with its whole limits; that it should forthwith be laid off into districts for the execution of process within the Indian country.
On the 11th of August, 1790, the president of the United States communicated to the senate, that upwards of five hundred families had settled on the Cherokee lands within the boundaries prescribed by the treaty of Hopewell, exclusively of those settled between the fork of French Broad and Holstein, who had refused to remove therefrom: “and as the obstructions to a proper conduct of this matter have been removed since it was mentioned to the senate, the 22d of August, 1789, by the accession of North Carolina to the Union, and the cession of the land in question, I shall feel myself bound, says the president, to execute the treaty of Hopewell, unless a new boundary can be arranged with the Cherokees embracing the settlements. 1. Is it the judgment of the senate, that overtures be made to arrange such boundary. 2. Wliat shall be the compensation to the Cherokees; and 3. Shall the United States stipulate solemnly to guarantee the new boundary which may be arranged. 1. Resolved, That the senate advise and consent to the arrangement of a new boundary, and compensation not exceeding one thousand dollars annually. 2. in case a new boundary be concluded, the senate do advise and consent solemnly to guaranty the same,” (Executive Journal, 60). Wm. Blount, as governor of the S. W. Territory and, superintendent of Indian affairs, proceeded to make the treaty of Holstein, concluded the 2d of July, 1791, fixing the new boundary, which excluded the white settlements; and by the seventh article, “the United States solemnly guarantied to the *307 Cherokee nation, all their lands not thereby ceded. ” The , . Cherokee lands were not to be trespassed upon; the treaty only goes to secure the Indians in the quiet enjoyment of the soil, without reference to jurisdiction. ■ But, by the tenth and eleventh articles, it is stipulated^ if any citizen of the United States shall commit any crime upon, or trespass against the person or property of any friendly Indian or Indians, which, if committed within the jurisdiction of any State or Territory, against a citizen or white inhabitant thereof, would be punishable by the laws of such State; such offender shall be subject to the same punishment, and shall be proceeded against in the same manner, as if the offence had been committed within the jurisdiction of the’ State to which he or they may belong. And if any Cherokee, or person residing among them, shall steal a horse from, or commit a robbery or murder, or other capital crime, on any citizen or inhabitant of the United States, the Cherokee nation shall be bound to deliver him up, to be punished according to the laws of the United States.”
These provisions were in affirmance of the stipulations made by the 6th and 7th articles of the treaty of Hopewell. No subsequent treaty with the Cherokees directly assumes to confer jurisdiction of their country on congress, or the United States courts; they only recognize former treaties, and require no critical examination.
Hów far are these treaties binding? By the constitution, “the president shall have power, by and with the advice and consent of the senate, to make treaties: provided, two thirds of the senators present, concur; and he- shall nominate, and by and with the consent of the senate, shall appoint ambassadors, and other public ministers.”
By the ninth article of the confederation, congress had the power of sending and receiving ambassadors; and entering into treaties and alliance; but by the 4th section, *308 congress could not enter into treaties or alliances, unless nine states assented thereto.
It is Notoriously true, that commissioners for Indian affairs, were not deemed ambassadors. Or did congress, .during the |confederation, assume to deal with the Indians, in virtue of the treaty making power; every resolve of that congress relating to Indian affairs, has been carefully examined, and are, together with the treaties or compacts to which they gave rise, unquestionably grounded upon the power conferred on congress, of regulating the trade, and managing all affairs with Indians, not members of any State; this was deemed to confer. the rights the king had before the revolution. Compacts with Indians never were ratified by congress, either by nine States or a majority, but were deemed full and complete, by the signature thereof, 1 Executive Journal, 27: nor under the constitution, has a public minister nominated to, and his appointment confirmed by the senate, for the purpose of treating with an Indian tribe, been known to our country for thirty years, although the practice was adopted in some instances, in the first administration of President Washington.
The history of requiring the advice and consent of the senate, to a treaty with Indians, is this: In September, 1789, (Ex. J. 26), the president, by message through the secretary at war, said to the senate, “It doubtless is important that all treaties and compacts formed by the United States, with other nations, whether civilized or not, should be made with caution, and executed with fidelity. It is said to be the general understanding and practice of nations, as a check on the mistakes and indiscretions of ministers and commissioners, not to consider any treaty, negotiated and signed by such officer, as final and conclusive, until ratified by the sovereign or government, from whom they derive their powers. This is the practice adopted by the United States, respecting their treaties with European nations, and I am inclined to think it -would be advisable to observe it in the conduct of our *309 Katies with the Indians; for though such treaties, being on their part made by their chiefs and rulers, need not be ratified by them; yet being formed on our part by the agency of subordinate officers,' it seems to be both prudent and reasonable, that their acts should not be binding on the nation, until approved and ratified by the government. It strikes me, this point should be well considered and settled, so that our national proceedings, in this respect, may become uniform, and be directed,by fixed and stable principles.”
He then states, certain Indian treaties were laid before the senate on the 25th of May, and asks, “whether those treaties were to be considered as perfected, and consequently, as obligatory, without being ratified?”
The message was committed to Mr. Carroll, Mr. Reed, and Mr. King. They reported, “that the signature of the treaties with the Indian nations, has ever been considered as a full completion thereof; and that such treaties have never been solemnly ratified by either of the contracting parties, as hath been commonly practised among the civilized nations of Europe, wherefore, the committee are of opinion, that the formal ratification of the treaty concluded, &c. is not expedient or necessary.
At-a future day, it was moved to postpone the report, and substitute fhe following: iCResolv&d, That the senate do advise and consent, that the President of the United States ratify the treaty concluded with the Wyandots,” &c. which passed.
That the lands occupied by the Indians, should continue in their occupancy until they consented to part with their use, was the settled policy of the British crown, and had become the settled policy of the United States. They were claimed as crown lands — ait. least all lying west of the mountains, and west of what is now Georgia, pertaining to the States united, whose common blood and treasure had won them, as a general fund to pay the national revolutionary debt. Of course the extinguishment of the Indian title *310 devolved on the United States as a common burden. The assent of the Indians to part with their title, could only be obtained by compact; it was the interest and business of the United States to make the compact and to pay for the cession; these treaties being formed by the agency, on our part, of subordinate officers,' President Washington thought it to be both prudent and reasonable, that their acts should not be binding on the national government, who had large sums of money to pay, until approved and ratified; and that the mode of approval should be the same as in case of treaties with European nations. This course was certainly prudent and just; but what evidence does it furnish, that the Indian tribes thus contracted with, were as to the separate states, foreign, sovereign, and independent? What was the object of these compacts? The acquisition of the soil, the lee to which, lying under the Indian right to occupy, was in the United States, and the sovereignty over it, in the individual States where the lands respectively lay. From the fact of our having treated with the Cherokees, is inferred ’ the other fact in Worcester’s case, that the Cherokee nation is a distinct community, foreign to Georgia, and in which her laws can have no force. The origin of the practice, or its subsequent prosecution, warrants no such conclusion. Compacts and treaties are made with nations b’eyond our jurisdiction, and a law established where acts of congress can have no force, and the good faith of the foreign power is relied upon to execute it within the foreign jurisdiction. Were the Indians ever deemed beyond the jurisdiction of congress? In the partition of powers between the separate States and the United States, the articles of confederation reserved the right to manage all affairs wj,th Indians; these were managed partly by resolves, and partly by compact. What has been the practice under the constitution? To pass laws punishing every crime committed by a citizen against an Indian, or by an Indian-on the person or property of a citizen, within the Indian limits- *311 bueh an assumption, m case of a foreign power, is im-beard oí. J.l congress bas jurisdiction to punish an In-dian for a crime against one person, surely tlie same power oan punish for all crimes, and against all persons; and it is only matter of discretion, that it is not exercised. The first law passed assuming to punish crimes committed within the Indian limits, was that of July, 1790, ch. 60; afterwards were passed, those of 1793, ch. 63; 1796, ch. 30; 1799, ch. 152, and the acts of 1802, ch. 13; and 1817, ch. 265; which are now in force, and under which,^ Indians and whites have been punished, capitally and otherwise, for many years. The act of 1817 is general, extending to all crimes and all persons, ánd declares the punishment shall be death, or otherwise, as is provided by the laws of the United States for the like of-fences, if committed within any place.or district of country under the sole and exclusive jurisdiction of the United States: Provided, that nothing in the act shall be construed to extend to any offence committed by one Indian against another within the Indian boundary^ The superior courts of the Territories of the United States, and the federal circuit courts, where the offender- is first brought to trial, shall have jurisdiction to try him. This act proceeds on the principle of that of 1790, and every subsequent one on the subject; yet it is assumed in Worcester’s case, .as. undeniably true, that “the Indian nations had always been considered as distinct and independent political communities, from time immemorial, with the single exception of that imposed by irresistible .power, which excluded them from intercourse with any European potentate other than the first discoverer; and that the recognition of this right was evinced by our history, in every change through which we have passed. To this we answer, and we do it with unfeigned regret, that'our political, legislative, executive, and judicial - history, so far from proving the recognition of die sovereign independence of the Indian nations within our limits, with the single *312 exception above, proves, and conclusively, directly the reverse. For more than forty years have we seen the Cherokees punished by virtue of acts of congress, for crimes committed in the Cherokee territory, and in the midst of their nation; and with this exercise of jurisdiction, a majority of us rested content — our people were protected by it. But at the October term, .1833, of the United States circuit court at Knoxville, in the cause of the United States vs. Bailey, the court pronounced the act of congress of 1817, unconstitutional and void, because the power “to regulate' commerce with the Indian tribes,” did not authorize punishment for crime; and on the ISth of November following, the State of Tennessee, as a matter of expediency, assumed jurisdiction, because it was believed the Indian government afforded no adequate protection to life' or property, or the person of the female. Like congress, we' desired to suppress crimes, and a very few of the higher'; yet we do not hold the heterodox of having jurisdiction' by halves; if our legislative a'nd judicial powers extend to the country, they extend to all its inhabitants; to govern, we must have power over all. This we have, or we have it not.
By the constitution of the United States, it is declared', “this constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made', or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every State shall be bound thereby; any thing in the constitution or laws of any Státe to the contrary notwithstanding.”
The constitution has assumed, that the government of -the United States would, like other governments of the civilized world, have occasion to enter into treaties with other independent powers upon the various subjects involved in their national relations. The department of the government in which the capacity to make such treaties should be lodged, was- designated.- No other department *313 possesses any right to interpose. When made and ratified, a treaty is the supreme law — is binding as a judicial rule. 1 Cra. Rep. 110. The only question is as to the extent of the power conferred on the president and senate: to what end may it be exerted? The effect of the power when exerted within its lawful sphere, is beyond controversy; but it has its limits; it cannot disregard and violate the constitution of the United States. By treaty with one nation, we cannot declare war with a third, because congress alone has the power to declare war. In the exercise of the treaty power, reference must be had to the nature of o,ur government. The country within is divided int.o distinct sovereignties, State and federal. The coexisting States are recognized by the constitution; have reserved to them all the jurisdiction they had before its adoption, not delegated to the United States, which rights cannot be destroyed or impaired by 'a treaty or act of congress. The rule is laid down accurately by Judge Story, (3 Com. 355). “A power given by the constitution, cqnnot be construed to authorize - a destruction of other' powers given in the same instrument. It must be construed, therefore, in subordination to it; and cannot supersede or. interfere with any other óf-its fundamental provisions. Each is equally obligatory, and of paramount authority within its scope; and no one embraces a right to-annihilate any other. A treaty to change the organization of the government, or annihilate its sovereignty, to overturn its republican form, or to deprive it of its constitutional powers, would be void, because it would destroy what it was designed merely to fulfil, the will of-the people.”
In the great debate had in the Virginia convention on the treaty making power, Mr. Madison and Gov. Randolph, denied that it involved a right of dismembering the ■Union; nor could the particular right of any State be affected by a treaty. 2 Elliott’s debates, 368, 371.
-As early as 1793, Mr. Hamilton, pre-eminent as a statesman, had declared in an official communication to *314 President Washington, “that the constitution having given p0W.er t0 president and senate to make treaties, they might malte a treaty of neutrality which should take from congress the right to declare war in that particular case, and under the form of a treaty they might exercise any powers whatever, even those exclusively given by the constitution to the house of representatives, (4 Jeff. Cor. 489). Mr. Jefferson, also of the cabinet, dissented from the opinion, holding, the president and senate, by treaty, were only authorized to carry into effect any powers they might constitutionally exercise; but in this opinion, it seems he had not then matured confidence. — Id. However, in 1803, on the French treaty ceding Louisiana being presented to him as president, he says: “I had rather ask an enlargement.of power from the nation, where it is found necessary, than to assume it by construction which would make our powers boundless. Our peculiar security is a written constitution. Let us not make it a blank paper by construction. I say the same as to the opinion of those who consider the grant of the treaty making power boundless. If it is, then we have no constitution. If it has bounds, they can be no others than the definitions of the powers which that instrument gives.” 4 Jeff. Cor. 3.
Besides these constitutional limits, the treaty power, like all others, has limits derived from its object and nature. It has for its object, contracts with foreign nations, as the powers of congress have for their object whatever can be done within our legislative jurisdiction, without the consent of foreign nations. A treaty can never legitimately do that, which can be done by law; and the converse of this, as a general, if not an universal rule, must be true. The constitution specifies the operations permitted to the federal government, and gives ajl the powers necessary to carry them into execution. Whatever of these enumerated objects is proper for a law, congress may make the law; whatever is proper to be ex- *315 eculed by way of treaty, the president and senate may enter into the treaty.
Admitting that the treaty power can be exerted to form international compacts with a people of our own country, and within the scope of the legislative power; and that Indian treaties are of higher dignity than mere contracts for the purchase of the Indian title to the lands they occupy, (which I believe they are not), still over the territory where the separate States had the power of legislation at the formation of the constitution, neither congress or the treaty power can take jurisdiction, because it is reserved to the States, and the people.
■Testing the treaties of Hopewell and Holstein by these rules, and how was it possible for them by agreement with the Indians, to create á jurisdiction in the United States, not under, but over the constitution, to punish crime within the limits of North Carolina. ’ North Carolina came into the union with the power to legislate for her whole territory. Tennessee was'admitted with all the rights of the original States; her constitution, of 1796, expressly declaring the power of exercising sovereignty, within limits accurately described by the( instrument, and on which condition she was accepted as one of the United States by congress.
To hold, that the president and senate, by treaty with the Cherokees, could create a power to legislate for them; and that acts of congress, punishing all crimes committed by our citizens on the Indians, or by the latter on our citizens, (as does that of 1817,) were warranted by the treaties, would be assuming that, by a combination of the two powers, new governments could be formed by an indirect and lurking authority in the constitution, certainly never claimed for it .by-its early advocates in the State conventions, called for its adoption.
■ But the understanding is, the United States assume to legislate for, and partially govern the Indians, in virtue of the authority, that “The congress shall have power to *316 regulate commerce with foreign nations, and among the several States, and with the Indian tribes.” How the constitution of the union, or its laws, more than those of States, could extend beyond the Cherokee boundary, into “a .distinct independent political community, with defined limits,” we leave to others to explain, when Worcester’s case shall be reviewed; our immediate business is with the recited clause. To regulate commerce; what is its meaning? The constitution is an instrument of enumeration, and not of definition; in order to ascertain the extent of the power conferred, it becomes necessary to determine the meaning of words. The power is to regulate, that is, to prescribe the rule by which the subject, “commerce,”is to be governed. It is not limited to traffic, ■to buying and selling, or the interchange of commodities. The words being general, so the sense must be general, and embrace all subjects comprehended under them, unless there be some limit in the nature of the power itself, or a repugnance to some other parts of the constitution. .Commerce is traffic, but it is more, it is intercourse between nations. In relation to foreign nations, and intercommunication by the coasting trade among the States, a main object was, the government of navigation and intercourse by this means. '
In the phrase, “commerce among the several States,” the word among, means intermingled with; commerce among the States cannot stop at the external boundary of each, but may be introduced into the interior; it means commerce, which concerns more States than one, not mere internal regulation and traffic. Under a different construction, one State might load another with imposts and taxes on the passage of goods and persons, ruinous to the interior.
This being • the admitted meaning of the sentence in ,its application to foreign nations, and the States, it must carry the same meaning throughout the sentence. 9 Wheat. 194: 2 Story’s Com. 510. Therefore, as to the *317 Indian tribes, it includes intercourse and traffic that interests more than one; in which the United States and the Indians'are both concerned. In the'execution of this power, congress has extended its legislation not to the Indian boundary, but over the Indian nation; assuming jurisdiction, not only over the regulation of commerce, but for the general punishment of crime.
Before the revolution, the British king claimed jurisdiction, and so far as the circumstances of the people would permit, governed the Indians. The congress of the confederation, claimed and exercised the same right within the territories claimed as crown lands, under the1' clause in the articles of confederation, giving the •power of regulating the trade, and managing all affairs with Indians, and the same power is now claimed for congress, under the authority to regulate commerce.
■ By the revolution, and the declaration of independence, the-rights of sovereignty, within the limits of each State, which belonged to the crown, devolved upon the State: with these powers the States stood clothed, when the articles of confederation were superseded, 'and the present constitution adopted. They had “a right to such degree of sovereignty, as the circumstances of the Indians would allow them to exercise,” within the language of the supreme court of the United States, in Johnson vs. M’Intosh. (8 Wheat. Rep.) This was sovereignty limited by discretion, and of course the right to its exertion was exclusively in the State. With part -of this power, to regulate commerce, congress was vested,, and the States are divested; each is exclusive in its sphere. And whether this State has parted with the power to punish the crime of murder, is the single question presented.to us? “That congress have not the power, is a proposition too clear for demonstration,” says Mr. Justice M’Lean, in the case of the United States vs. Bailey.
The same was holden in the cause of the United States against Jonathan Cisna, in the circuit court of *318 Ohio, at the July term, 1835. The defendant had been indicted for horse stealing, within the reservation of the Wyandott tribe of Indians, in the State of Ohio, from Jacko, a friendly Indian. He demurred, for want of jurisdiction to the indictment, and the demurrer was sustained; but the defendant was ordered to be delivered over by the marshal, to the State authorities, to be indicted and punished in the State .courts.
The Wyandott tribe reside on twelve miles square, within the limits of Crawford county, Ohio. Various treaties have been made with them, commencing with the year 1785, and concluding with that of 1818, which are the same in political effect as the treaties made with the Cherokees. That the intercourse law of 1802 operates upon the Wyandotts, admits of no doubt, says the court in Cisna’s case. But was it constitutional, so far as it assumed to punish the crime of larceny? which was holden in the negative. No man in the United States has had the Indian question presented to him so often, and in so many aspects, as Mr. Justice M’Lean, and in a form to call forth the most thorough investigation, and the following is the result: “During the whole course of our connection with the Indian tribes, we have recognized in them a power to make treaties, and certain political relations exist, growing out of treaties between the federal government and almost every distinct tribe of Indians within our national limits. These relations may be extended by treaties as far as sound policy, in the discretion of the treaty-making power, shall admit, where the Indians reside beyond the limits of a State, but within those limits, neither the treaty-making power, nor the legislative power, can be exercised, so as to abridge the rights of the State. Congress can exercise no power on this subject, beyond the regulation of commerce with the Indian tribes.”
With this position, as to fact and conclusion, I decidedly concur; and I take the law in this State to be, that the government of the United States, neither by the power to regulate commerce, nor by the treaty-making *319 power, or by both combined, has authority to punish for the commission of crime within the' Cherokee limits.
The Cberokees are overrun by the whites, their gov-eminent is broken up and suppressed by Georgia, their few people within ourlimitsare so scattered and feeble, as not only to be incapable of self-government, but they are wholly incapable of protecting themselves, or the whites among them, against individual depredation upon persons or propeity. Their’s is, emphatically, a land without law, if our laws do not reach it, and so to-all appearance it must remain. ,
If the federal power holds us out, and declares it has no right to enter, then there will be, within the bounds of tins Union, a lawless territory, where sanctuary is found for the murderer, the robber and the-thief, free from molestation. ^uch is now incontrovertibly the fact. That such a state of things cannot long be submitted to, requires but a small portion of practical wisdom to foresee from the bench of justice, as well as from the halls of legislation, whatever may be supposed’ to the contrary. It is not with a case of speculative philosophy we have to do, but with a matter of expediency, having but one remedy in the nature and structure of our government, and that remedy the legislature of 1833 applied. The supposition, however, that the State has the right to assume jurisdiction because of necessity,J although before such necessity arose, she had no power,- and the Chero-lcees were independent of her authority, is inadmissible. If the Cherokees from the beginning were independent of the State, they were, and now are, foreign to us, as a sister State is, or as Louisiana before its_acquisilion was; and we cannot notice their feeble condition, more than we could the condition of an adjoining State, or foreign province. We have no power of conquest. Congress, alone, can only declare war with an independent nation, and the'president and senate make peace. The power to make conquest, without the power to make war, will *320 not be assumed; and the right to govern a foreign and in-* dependent people, without conquering them first, is equally untenable, or have we any right to interfere in their domestic concerns. It is on the right of discovery and right of conquest, "pertaining to the British crown, and devolving on us by the American revolution, and on the conquest by that event, that our jurisdiction must rest, and to seek for it any other support would be idle, because useless. The theory of the jurisdiction is not open to question, and the practice upon it is of long standing, first . in the colonies and after in the States of Massachusetts, Maine, Rhode Island, Connecticut, New Jersey, Virginia, the Carolinas and New York. 3 Kent’s Com. 391, 395. And recently, the States of North Carolina, Georgia, Tennessee and Alabama have extended their laws over the Cherolcees, Creeks and Choctaws within their respective limits, as has Mississippi extended hers over the Chickasaws, and Ohio hers, over the Wyandotts and other tribes. But the most remarkable instance of the kind occurred in New York, in 1822. An Indian of the Seneca tribe, named Soo-non-gise, or Tommy Jemmy, was indicted in the State court at Buffalo, for the murder of C. an Indian woman. He pleaded to the jurisdiction of the court, that before the foundation of the colony of New York, and before that State became free and independent, and ever since, the Seneca nation of Indians was, and has been, and is independent, exercising the powers and rights of sovereignty, and have had, and still have power and authority to try their own people for crimes and offences committed on their own lands, and against their people; and particularly to exercise exclusive jurisdiction over their own people for the crime of murder. And that the power of trying and punishing the people of the Seneca nation of Indians, for the crime of murder, so as aforesaid committed, 'is and ought to be lawfully exercised exclusively by the councils of the chiefs, sachems and warriors of the Senecas. That the prisoner *321 Ms an Indian belonging to and residing .with the Senecas, and that the Indian woman killed was then, and there belonging to, and residing with .the Senecas, and that the acts of violence, imputed to the prisoner, were committed within the Buffalo reservation, and the offence cognizable before the councils of the chiefs, &c., of the Seneca nation of Indians, and not before the eourt of oyer and terminer.
A replication was put in, denying and traversing the . material facts set up in the plea. -.
A jury was impannelled to try this collateral issue, who, after hearing evidence, found that the facts set up in the plea were true.
The prisoner was brought before the supreme court of New York, on habeas corpus, and all the proceedings were removed into that court by certiorari. A motion was then made by the attorney general, for judgment on the'plea", the verdict notwithstanding. The question of law was elaborately argued on the part of the prisoner and the State, and the court took time for deliberation,* and bailed the prisoner in the mean time. It did not proceed to judgment, but reported the facts to the governor, with the further fact, that ,the Senecas had ever theretofore punished their own people for all crimes^ committed within their reservations, of which the courts of "New York had not assumed jurisdiction, and that it was unfit and unjust to inflict punishment until the Senecas should be admonished by the State, to desist from taking cognizance of crimes punishable with death, and a pardon was recommended.
But the court declare, “We are decidedly of opinion, that it is competent to the legislature to pass a declaratory act, having a prospective operation, - asserting in such cases the exclusive jurisdiction of the courts of the State. It would, we think, be a solecism to maintain that our jurisdiction extended over the whole State,, and yet there were parts-of it, to which it did not.extend. We believe *322 the jurisdiction of our courts has never been denied where an Indian has killed one of our citizens within an Indian reservation. Such a case occurred some years since, and jurisdiction was assumed by our courts without a question being raised. Having then jurisdiction throughout the reservations, it would seem to us not material by whom, or upon whom an offence was committed; for no principle is more clear, than that all persons, of whatever nation, so long as they remain under the protection of the government, owe to it a> temporary allegiance, and are amenable for crimes committed during the continuance of that allegiance. The case of the Indians within our borders is a peculiar one, but still we cannot perceive that they are not to be amenable for crimes. These considerations seem to require legislative interposition.”
The governor communicated the report of the supreme court to the legislature, and the message and documents were referred to the committee of courts of justice.
The committee reported, that they fully coincided with the views of the supreme court, and in the necessity of a declaratory act: and that on consultation with the judges of the supreme court, the committee thought that it would not be expedient to allow to the Indians the right to punish their own people for a violation of the laws of the State, in any case; and had leave to bring in a bill, which recites: “Whereas, the Seneca and other tribes of Indians, residing within this State, have assumed the power and authority of trying and punishing, and in some cases capitally, members of their respective tribes for supposed crimes by them done and committed in their respective reservations, and within this State. And whereas, the sole and exclusive cognizance of all crimes and offences committed within this State belongs of right to the courts holden under the constitution and laws thereof, as a necessary attribute of sovereignty, except only crimes and offences cognizable in the courts deriving jurisdiction under the constitution ánd laws of the United *323 States. And whereas, it has become necessary to make .... . mi r , ., J , . provision m the premises: ihereiore, be it enacted, that the sole and exclusive jurisdiction of trying and punishing all and every person, of whatever nation or tribe, for crimes and offences committed within any part of this State, of right belongs to, and is exclusively vested in the courts of justice of this State, organized under the constitution and laws thereof.” Sess. acts 1832, p. 202.
By the third article of the constitution of New York, the governor, the chancellor and the five justices of the supreme court, are a council of revision of all bills about to be passed by the legislature. After a bill is passed by both houses, it must, before it becomes a law, be submitted to the governor and the council of revision, (two judges presiding with the governor being sufficient,) and be approved by them, or returned with their reasons, and passed by two-thirds of each house. ■
In 1822, De Witt Clinton was governor, James Kent, chancellor; Ambrose Spencer, chief justice of the supreme court; with William W. Yanness, Joseph C. Yates, Jonas Platt and John Woodworth associate justices.
New York caused to be revised her statutes, which, after years of study and correction, were reported to the legislature in December, 1828, by John Duer, Benjamin F. Butler, and John C. Spencer, the persons appointed for that purpose, with a provision conferring exclusive jurisdiction on the State courts to punish Indians, as well as others, for crimes and offences committed within the boundaries of that State; and which law was adopted as part of the revised code, and is now in force.
The statute of New York had the sanction of the executive, legislative and judiciary departments of that government; and these filled with men standing high for legal and political learning to a very uncommon extent; and is entitled to great regard as an authority in favor of State jurisdiction. ■ ■
The same position was maintained by the supreme *324 court New York, in Jackson vs. Goodell, (20 Johns, R. 192-3,) in which Chief Justice Spencer, in delivering the opinion of the court, says, and most truly, “I know ofno half-way doctrine on this- subject.' We either have an exclusive jurisdiction, pervading every part of the State, including the territory held by the Indians, or we have no jurisdiction over their lands, or over them, whilst acting within their reservations. It cannot be a divided empire; it must be exclusive, as regards them or us.”
This course of legislation has been sanctioned by the opinions of our most distinguished public men, when acting in official stations. Thus, in 1814, when treating with Great Britain at Ghent, the consideration of Indian independence was powerfully urged on our commissioners, Messrs. Adams, Bayard, Clay and Russell. The second point presented for discussion was, ’“The Indian allies of Great Britain to be included in the pacification, and a boundary to be settled between the dominions of the Indians, and those of the United States. . Both parts of this point are considered by the British government, as a sine qua non to the conclusion of a treaty.” 9 Am. St. Papers, 327.
Great Britain actually refused to treat, unless an Indian sovereignty, extending from New York west along the whole line of the lakes, was recognized by the treaty. Our commissioners rejected, as wholly inadmissible, the assumption, that the Indian tribes residing within our limits could be treated'with as independent powers. The British commissioners charged, “That the American government has now for the first time in effect, declared that all Indian nations, within its limits of demarkation, are its ■ subjects, living there upon sufferance, on lands which it also claims the exclusive right of acquiring, thereby menacing the final extinction of those nations.” 390.
- To this charge our commissioners reply, that had the United States so asserted, far from being the first in making that assertion, they would only have followed the prin *325 ciples uniformly and invariably asserted m substance, r ■ i ,• , , T, . . , frequently avowed m express terms by the British government itself. It is asked, wbat was the meaning of all the colonial charters granted by the British monarchy, from that of Virginia, by Elizabeth, to that of Georgia, by George II, if the Indians were the sovereigns and proprietors of the lands bestowed by those charters? What was the meaning of the article in the treaty of Utrecht, by which the five nations were described in terms as subject to'the dominion of Great Britain; or that with the Cherokees, by which it was declared, that the king of Great Britain granted them the privilege" to live where they pleased, if those subjects were independent sovereigns, and if these tenants, at the license of the British king, were the rightful lords of the lands where he granted them permission to live? “What was-the meaning of that proclamation of his present Britannic Majesty, issued in 1763, declaring all purchases of lands from Indians null and void, unless made by treaties held under the sane tion of his majesty’s government, if the Indians have the right to sell their lands to whom they pleased?”
Other similar treaty stipulations with European powers were referred to as evidence, that Great Britain, whilst in possession of this country, treated the Indians as subjects and claimed the right of soil; and it was maintained, that we only claimed the right devolved on us by the revolution of government, and which we exercised in a much milder form than Great Britain-had. That the principles assumed by Great Britain and the United States, had been uniformly recognized by the Indians themselves, not only by the treaty of Greenville, made by General Wayne, in 1795, but in all other previous, as well as subsequent treaties between them and the United States. That the treaty of Greenville was declaratory of'the public law in relation'to the parties, founded on principles previously and universally recognized. It left the United States the right of exercising sovereignty, and oi acquiring soil; *326 whereas, the proposition of Great Britain required the abandonment of both.
The government of the northwestern territory had been extended by the United States over the whole country, claimed by Great Britain for her Indian allies, as early as 1787, which had been in full exercise for twenty-five years before the country was claimed to be independent, which claim extended from the Ohio to the Lakes, and northwest indefinitely. (9 Am. St. Papers, 394, 396: 1 vol. Acts Cong. 398, 475; edit. of 1815.) .It included, in 1814, an hundred thousand citizens of the United States.
, After Mr. Gallatin was added to our commission, the proposition of fixing an Indian boundary, and recognizing by the treaty of peace an Indian sovereignty intermediate between the provinces of Canada and the United States, was still insisted upon as a sine qua non, on the part of Great Britain, and was again brought into anxious discussion. The negotiation had been in progress almost exclusively on this single point for two months, and had been deeply considered by men the most eminent for research and ability, when by a note it was declared, “The United States cannot consent that Indians, residing within their boundaries, as acknowledged by Great Britain, shall be included in the treaty of peace, in any manner which will recognize them as independent nations, whom Great Britain, having obtained this recognition, would hereafter have the right to consider in every respect as such.” That such a recognition would take from the United States, and transfer to those Indians all the rights of soil and sovereignty over the territory they inhabit; and that it was not perceived in what respect such a provision would differ from an absolute cession by the United States of the extensive territory in question: 409. That the right of protection claimed by Great Britain before the revolution, and by the United States since, over the ''.Indians within our limits, wás a right of sovereignty *327 which needed no Indian treaty to confer, arid which the abrogation of no Indian treaty could divest. Great Britain asserting, that the treaty of Greenville had been abrogated by the war. That a similar assumption, on the part of France, had been rejected on this express ground", by the eldei Pitt, in the negotiation, which resulted in the treaty of 1763. That the Indians could only be treated for on principles, by which amnesties are stipulated in favor of disaffected persons, who, in times of war and invasion co-operate with the enemy of the nation to which they belong. That they (our commission) had no instructions to treat of such matters, nor would they ask for any such instructions. The British commission, feeling the conclusive weight of the argument, in reply submitted as an ultimatum: That the peace concluded should extend to the Indian allies of Great Britain, and they be restored to all the possessions, rights and privileges they enjoyed before the war. This was an utter abandonment of the assumption pressed as a sine qua non, for the first two months after the negotiation opened, nor was there the slightest objection to the ultimate proposition on our part, and which of course was accepted. Id. 421.
But suppose our commissioners had repliéd to those of Great Britain, that the northern nations of Indians had always been considered as distinct independent political communities, retaining their original natural rights, as the undisputed possessors of the soil from time immemorial, with the single exception of that imposed by irresistible power, which restrained their intercourse with foreign nations; that this right was all the British crown had, or was transferred to us by the treaty of 1783, in the language of the supreme court, in Worcester’s case, and had admitted the consequent conclusion, (one that no statesman dare deny on the assumed facts,) that the treaty of Green-ville, and every other treaty with the northern nations of Indians -engaged in the war against us, was abrogated by the war; and suppose that new boundaries had been fixed *328 ^ ^ie treaty °f peace of 1814, for these independent communities, and they recognized as distinct from the United States; what would have been the consequence? An instant and unanimous rejection of the treaty beyond doubt. Our commissioners were not so wanting to their own characters as statesmen, as to expose themselves to the" odium at home, of inserting an unauthorized article in the treaty, which even threw a shade of doubt on our claim to sovereignty. They say to those of Great Britain: “But to surrender both rights of sovereignty and of soil over, nearly one-third of the territorial dominions of the United States, and to a number of Indians not probably exceeding twenty thousand, the undersigned are so far from being instructed or authorized, that they assure the British commissioners, that any arrangement for that purpose would be instantaneously rejected by their government.” Id. 380.
From the proceedings in congress of 1830, when it was proposed by the message of the president, that provision be made for the removal of the Indian tribes within any of the States and territories, and for their permanent settlement west of the river Mississippi, much information may be obtained, arid of a highly authoritative character.
In 1824, during Mr. Monroe’s administration, the secretary of war, Mr. Calhoun, informed the Cherokees, through their delegation, “you must be sensible, that it will be impossible for you to remain for any length of time in your present situation, as a distinct society or nation, within the limits of Georgia, or any other State. Such a community is incompatible with our system, and must yield to it. This truth is too striking and obvious not to be seen by all of you. Surrounded as you are, by the people of the several States, you must either cease to be a distinct community, and become at no distant period a part of the State, within whose limits you are, or remove beyond the limits of' any State.”
*329 During the last years of Mr. Monroe’s administration, and through that 'of Mr. Adams, reports to congress from the executive department were made, favorable to removing the Indians residing within the States and Territories, to beyond their limits, but no definite step was taken upon the subject. The foregoing letter states the leading ground for the policy. President Jackson, in his first message to congress, in December, 1829, urges the same policy, and among other reasons for it states, “a portion of the southern tribes having mingled much with the whites, and made some progress in the arts of- civilized life, have lately attempted to erect an independent government within the limits of Georgia and Alabama. These States claiming to be the only sovereigns within their territories, extended their laws ever the Indians; which induced the latter to' call upon the United States for protection. Under • these ■ circumstances, the question presented was, whether the general government had a right to sustain those people in their pretensions ?
The constitution declares, that “no new State shall be formed or erected within the jurisdiction of any other State,” without the consent of the legislature. If the general government is not permitted to tolerate the erection of a confederate State within the territory of one of ?the members of this Union, against her consent, much less could it allow a foreign and independent government to establish itself there. ■ Georgia became a member of the confederacy, which eventuated in our federal Union, as a sovereign State, always asserting her claim to certain limits; which having been originally defined, in the colonial charter,' and subsequently recognized in the treaty of peace, she has ever since continued to enjoy, except as they have been circumscribed by her own voluntary transfer of a portion of her territory to the United States, in the articles of cession of 1802; Alabama was admitted into the Union on the same footing with the original States, with boundaries, ■'which were prescribed by congress. *330 There is no constitutional,' conventional, or legal provi-vjgjon^ aiiows them less power over the Indians within their borders, than is possessed by Maine or New York. Would the people of Maine permit the Penob-scot tribe to erect an independent government within their State? and unless they did, would it not be the duty of the general government, to support them in resisting such a measure? Would the people of New York permit each remnant of the Six Nations within her borders, to declare itself an independent people, under the protection of the United States? Could the Indians establish a separate government on each of their reservations in Ohio ? and if they were so disposed, would it be the duty of the government to protect them in the attempt? If the principles involved .in the obvious answer to- these questions be abandoned, it will follow, that the objects of this government are reversed; and that it has become a part of its duty to aid in destroying the States which it was esta* blished to protect. Actuated by this view of the subject, I informed the Indians inhabiting parts of Georgia and Alabama, that their attempt to establish an independent goyernment, would not be countenanced by the executive of the United States; and advised them to emigrate beyond the Mississippi, or submit to the laws ■ of those Spates.”
This part of the president’s message was referred to the respective committees on Indian affairs, in the senate and house of representatives of the United States.
The committee of the senate declined to express an opinion directly upon the validity of the conflicting claims of Georgia and Alabama, and the Indians; yet the attention of the. senate is called to some of the leading facts and main points, upon which the controversy depends. “The title of the Cherokees, (it is said), must rest upon their original right of occupancy, and the treaties formed with the United States. As to the first, their title by occupancy; the answer would be, when the country was dis *331 covered, they were savages; and that this discovery, of itself, gave the discovers a right to form settlements, and to exclude other nations. That it conferred upon the nation of the discoverer and settler, the right to acquire the usufruc-tuary interest the natives had. It would be added, that at a very early period, the Cherokees formed a treaty with Great Britain, by which they gave up their independence, and put themselves under the protection of his Britannic majesty. That they took part with the British crown in the war of the revolution. That the American arms were employed against them, and they conquered, when independence was acknowledged, and the treaty of peace made with Great Britain. That this conquest conferred upon the respective States within whose limits they were, all the rights, and gave them all the powers, which the crown had prior to the revolution. That this right still continued in the States, and was never yielded to the United States.”
The committee of the House reported, that the Indians had been indulged in the practice of their ancient habits and usages, and exempted from the ordinary burthens of the State, so that the action of the government upon them was only palpable to the observation of the public in the trials, and sometimes in the executions that followed for the breach of criminal laws.” That these circumstances of their situation appear to have lecLsome to suppose, that a portion of the .ancient independence of these tribes still remained, which the States in the exercise of their jurisdiction could not affect. The committee, upon this point, concur in the opinion of the supreme court of New York, expressed in a cause in which this question incidentally arose, and in which the distinguished judge, who delivered the opinion of the court, declared, that he “knew of no half way*doctrine on this subject. A State either has jurisdiction, or it has it not. The authority which can rightfully punish offences against the peace and morals, and wrest from Indian tribes the exercise óf a part of their ancient *332 usaSes’ *s competent to abolish the whole. The principle upon which this jurisdiction is assumed, does not admit of division.” And a bill was reported. 1 A greater portion of these reports would be given, but for their extensive circulation and recent date. A majority of congress concurred in them, and grounded thereon the most important measure — that for the removal of the Indians west of the Mississippi — known to the history of our Indian relations.
In a question almost purely political in its character,, the official and deeply considered acts of the federal power, executive and legislative, ought to have great weight with the courts of justice, so that conflict between the departments of the government may be avoided.
Contrary to my usual habit, it has been deemed expedient in this cause to set forth in something of detail, the authorities by which my mind has been brought to the conclusion, that the act of 1833 is constitutional. The subject is amongst the most complicated and difficult ever presented for judicial decision — involving the fate of a people. We are asserting a principle covered up under the history of near four centuries; resting in the depths of a papal supremacy, once wonderful, and overpowering to an extent, hardly within the compass of belief at this day; to which kings and emperors bowed with the humblest submission, requiring for its establishment, historical proof, rather than inductive argument. A principle which asserts the law of force, as the rule of right, established so long that we cannot recede from it: — we dare not say the unconverted heathen was not a perpetual enemy to the Christian, or that he had political rights independent of us, without saying to the red man of this continent, take your own, we are your subjects, the country is yours, and the right to govern it yours; without saying to the enslaved black man of Africa, go in peace! you was enslaved fey superstition and fraud, and are free as we are.
The principle, that the monarch of tire first Christian discoverer of a heathen land, was the sovereign lord of that *333 land, and that all unconverted savages found there, were without rights, and subject to the jurisdiction of fire country of the discoverer, comes in conflict with our religion, and with our best convictions of a refined and sound morality, yet it is necessary, boldly and firmly to assert and support it; our individual titles to lands, from the Atlantic to the western Missouri line, depend upon its firm and un-quailing support, regardless of its origin. The title of every slave in America, North and South, rests on no better or different foundation. Time and necessity have lent it their sanction; it is the law of the land. History of Columbus-by Irving, 391.
In the argument of this cause, some stress was laid upon expressions used by this .court, in the causes of Cornet vs. Winton, and Pathkiller vs. Blair, in 2 Yerg. 150, 411. The court was proving that, which no one will at this day controvert, that the Cherokees had the exclu sive right to enjoy their own territory; but they are de dared to be a conquered people with this acknowledged right. So, again, in Pathkiller’s case, when treating of the influence of the act of 1783, on the Indian title, the court says, the Cherokees were a dependent people, but governed by laws of their own, and having a country of their, own; and that North Carolina had not, and could not-legislate upon then- title until she incorporated them into the State government; but that she had the right to do so, is most forcibly implied.
In Holland vs. Pack, (Peck 151,) it was adjudged, “That an Indian residing within the bounds'of the Cherokee country, beyond the treaty line, was not subject to be sued under our laws, for a default as an inkeeper, being governed by the laws of the Cherokees.” How could it be decided otherwise? Our laws had not been extended to the Cherokee country in 1815, when the transaction took place, and had no force there. This is the whole case, and it matters little what language the court used in the opinion, given at a time and place where aid *334 from not a single book on the subiect was had. 11ns . ? ,. , , , cause is strongly relied on to sustain the assumption, that the Cherokees are an independent nation, but with very little reason. The great cause of Johnson vs. M’Intosh, is in the face of all loose expressions tending to sustain Indian sovereignties, and as an authority to the contrary, is confidently believed to be of unequalled merit. There was not the least necessity in Worcester’s case to contradict a single principle assumed in that of Johnson against M’Intosh. By the act of 1830, of Georgia, it is provided, that all white persons residing within the limits of the Cherokee nation after the first of March, 1831, without a license, or permit from the governor of Georgia, or his authorized agent, and without having taken an oath to support the constitution and laws of Georgia, shall, on conviction, be confined in the penitentiary not less than four years — with the exception of Indian agents of the United States, women and minors. Worcester was indicted for residing in the nation, without having taken the prescribed oath. He pleaded, among other things, that he entered the Cherokee nation in the capacity of a missionary, under the authority of the President of the United States, and had continued there under such authority; that he had been engaged in preaching the gospel to the Cherokee Indians, and in translating the sacred scriptures into their language, with the permission and approval of the Cherokee nation, and in áccordance with the humane policy of the government of the United States, for the civilization and improvement of the Indians, and that his residence there for this purpose, is the residence charged in the indictment.
The plea was declared no defence, and overruled. Ply the act of congress of 1819, the president of the United States is authorized, with the consent of the Indians, to introduce among them the means to civilize and instruct them, and to employ fit and capable persons to teach the Indians agriculture, and their children reading, writing and *335 arithmetic, “and for performing. such other duties as may be enjoined by the instructions of the president.” To execute this policy, tire sum of ten thousand dollars annually is appropriated. That the residence o.f Worcester was within the sanction of the act of 1819, is not open to question.
The power to regulate commerce- with the Indian tribes, is in congress; it extends to personal, intercourse. The mode of intercourse was prescribed by the act cited; this is the supreme law, and that of Georgia is void, so far as it comes in conflict with it. The correctness, therefore,, -of the judgment, ordering Worcester to be discharged from the penitentiary of Georgia, is not called in question, far from it; but the controlling and conclusive position assumed as the basis of that judgment, that the Indian nations were distinct and sovereign political communities, independent of the States., is confidently believed to be incorrect, and that sooner or later it must be abandoned.
From the foregoing facts and arguments, have been drawn the following conclusions.
1. That the right to subdue and govern infidel savages found in countries newly discovered by Christians, pertained to the first Christian discoverer. By this rule, the Indians found on this continent, the Cherokees inclusive, were allowed no political rights, save at the discretion of the European power that colonized the country. Such is the international law as declared by papal' authority — such is the common and national law as declared in Calvin’s case; and such the only possible rule that could be observed by our ancestors. That the colonial charter of Charles II, rightfully conferred sovereign power to govern all' the people abiding within its limits, and which the courts of the colony would not disregard in cases of Indian culprits, and refuse to punish those charged with crimes. That the royal government, after 1729, had, and exer *336 cised at,discretion, the same authority; and by the revolution, it devolved on the State of North Carolina.
2. But waiving this ground. We have the right, at our election, to exercise sovereign power over the Cherokee country, and to govern all residing there, by the right of conquest. This is evidenced by the treaty of 1730; by that of 1783 with Great Britain; but especially by the treaty of Hopewell. We won the sovereignty from Great Britain, and from her ally, the Cherokees, when the country was conquered to the east bank of the Mississippi in the war of the revolution. This right devolved on North Carolina; and after our separation from the mother State, remained an unimpaired power by compact in the South V^est Territory, and then in the State of Tennessee.
3. The treaty making power, as exercised with Indian tribes, cannot deprive a State of a part of the jurisdiction it once possessed. The power is not over, but under the constitution, and like others, restrained by the instrument giving it existence; it cannot, in times of peace, cede away to a people independent of the State, a part of its territory and sovereignty: if a part could be ceded, the whole might, and the State be extinguished. The right to destroy one State would be equal as to all. The States are emphatically the basis of the Union and federal constitution; to extinguish them is to extinguish the constitution — ■ to leave it nothing to operate upon.
4. Congress has no power to make a new State of the Union, of parts of other States, without the consent of the legislatures of the States concerned; it has no power to erect an independent sovereignty not of the Union of parts of States, with or without their assent; and to maintain the Cherokee government in its independent form by acts of congress, would be the establishment of a form of government unknown to the constitution, and in violation thereof, because no conferred power authorizes legislation that dissevers the States. Nor can the treaty power, and the poWer to legislate combined, do the same thing. If *337 the treaty of Hopewell, or of Holstein, authorizes congress to legislate, excluding the jurisdiction ol the btates from the Indian territory, then the treaty is a constitution as between the Cherokee nation and the federal government, to which, the States of the Union are no parties; the treaty and acts of congress grounded on its authority, are superior to and destructive of the constitution, so far as this guaranties to every State a republican form of government, and sovereignty to the whole extent of its limits. Congress can have no created authority, aside from the’ constitution.
5. Congress has power to regulate commerce with foreign nations, and among the several States, and with the ’Indian tribes. Grounded on this power, laws .have been passed to punish every grade of crime committed within the Indian limits, operating equally on whites and Indians. If authority exists for the exercise of this highest of jurisdictions, it must for all purposes, and to every extent, at discretion: and as the same construction must run through the sentence, if the power to regulate commerce authorizes legislation for the punishment of all crimes, and the assumption of general jurisdiction over Indian nations, by the same clause, may the same jurisdiction be exercised over every State of the Union, at the discretion of congress. There is no escape from this conclusion. That no such power exists in reference to the States, will be admitted, and that none such exists in relation' to the Indians, follows.